UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE SOUTHERN NEW ENGLAND | : | |
| TELEPHONE COMPANY, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| v. | : | 3:04-cv-2075 (JCH) |
| | : | |
| GLOBAL NAPS, INC., | : | |
| Defendant. | : | APRIL 27, 2006 |

**RULING ON DEFENDANT'S MOTION TO COMPEL ARBITRATION [DKT. NO. 56]**

The defendant, Global NAPS, Inc. ("Global NAPS"), has moved, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-14 ("FAA") against the plaintiff, the Southern New England Telephone Company ("SNET"), to compel the arbitration of certain claims asserted by SNET in its complaint. Specifically, Global NAPS moves to compel the arbitration of the Counts I and V of SNET's complaint, which assert that Global NAPS ordered "special access circuits" under SNET's federal special access tariff and failed to pay SNET for use of these circuits. Global NAPS argues, inter alia, that these claims are subject to the mandatory arbitration provision of the interconnection agreement ("ICA") between the parties. In response, SNET argues, inter alia, that Global NAPS has failed to demonstrate that these claims fall within the scope of the mandatory arbitration clause of the ICA. For the following reasons, Global NAPS' motion to compel arbitration is DENIED. Global NAPS also moves to dismiss the entire action for lack of subject matter jurisdiction. Global NAPS' motion to dismiss for lack of jurisdiction is DENIED. SNET's motion for leave to file a surreply is GRANTED.

1

I.      **FACTUAL BACKGROUND**

SNET and Global NAPS are telecommunications carriers that have entered into arrangements for the provision of telecommunication services to Connecticut customers pursuant to the Telecommunications Act of 1996.  Details concerning the arrangements between SNET and Global NAPS, as well as descriptions of the claims in SNET's action against Global NAPS, are recounted more fully in this court's October 25, 2005 ruling on Global NAPS' motion to dismiss.  See October 25, 2005 Ruling, pp. 1-5 [Doc. No. 38].

In its complaint, SNET alleges that, between 2002 and 2004, Global NAPS ordered twenty-six special access circuits pursuant to the terms and conditions for special access services that are set forth in SNET Tariff F.C.C. No. 39.  Complaint, ¶ 11 [Doc. No. 1].  SNET further alleges that it provided the special access circuits, billed Global NAPS for the circuits pursuant to the federal tariff, and that Global NAPS has not made a single payment to SNET, despite SNET's repeated attempts to collect. Id. at ¶ 12-14.  SNET alleges that, as of October 7, 2004, Global NAPS owed SNET $1,757,341.54 for the use of these circuits.

SNET also asserts several causes of action regarding what it describes as the "misrouting" by Global NAPS of certain network traffic over "meet point trunks" that are reserved for other traffic under the parties' ICA.  SNET has argued that the two sets of claims, i.e., the special access circuit claims and the misrouting claims, are independent of each other, while Global NAPS has argued that they are related.

In support of its motion to compel arbitration, Global NAPS has submitted the

2

dispute resolution provisions of the parties' ICA.[1] Section 10.2 of the ICA provides that:

> The Parties desire to resolve disputes arising out of this Agreement without litigation.  Accordingly, the Parties argee to use the following Dispute Resolution procedures with respect to any controversy or claim arising out of or relating to this Agreement or breach.

Def's Ex. 1.  The ICA goes on to describe three separate dispute resolution methods: "service center" dispute resolution for disputes related to billing; informal dispute resolution; and formal dispute resolution, which includes the mandatory arbitration of some claims.  Id., 10.4 - 10.7.  Section 10.6.2.1 provides that the following claims, if not settled through informal dispute resolution, will be subject to mandatory arbitration:

> Each unresolved billing dispute involving one percent (1%) or less of the amounts charged to the Disputing Party under this Agreement in the state in which the dispute arises during the twelve (12) months immediately preceding receipt of the letter initiating Dispute Resolution under Section 10.3.  If the disputing Party has not been billed for a minimum of twelve (12) months immediately preceding receipt of the letter initiating Dispute Resolution under Section 10.3, the Parties will annualize the actual number of months billed.

Id., 10.6.2.1.  The ICA also provides that the following claims are not subject to mandatory arbitration:

> 10.6.4.1.   Actions seeking a temporary restraining order or an injunction related to the purposes of this Agreement.
> 10.6.4.2    Actions to compel compliance with the Dispute Resolution process.
> 10.6.4.3    All claims arising under federal or state statute(s), including antitrust claims.

Id., 10.6.4.1-3.

Global NAPS has not submitted any evidence other than the ICA in support of its

---

[1]The complete ICA can be found as Exhibit A to Global NAPS' February 4, 2005 Memorandum of Law in Support of its Motion to Dismiss [Doc. No. 13].

motion to compel arbitration.  In its Memorandum of Law in Support of Its Motion to Compel Arbitration, it asserts that it is undisputed that the special access circuits at issue in Counts I and V of SNET's complaint are the same facilities as the "meet point trunks" at issue in the other counts of SNET's complaint, and, thus, the Counts I and V are disputes within the scope of the mandatory arbitration provision of the ICA.  See Def's Memo. of Law. in Supp., pp. 2, 8, 9.  In support of these assertions, Global NAPS cites to statements made in SNET's pleadings, which, Global NAPS argues, demonstrate that these assertions are correct and have been conceded by SNET. Global NAPS also asserts that "there is no question that the collection claims involve sums of 'one percent . . . or less' of the total so-called "special access" charges to Global NAPS invoiced by SNET."  Id., p. 7.  By way of proof of this assertion, Global NAPS offers a mathematical proof which it claims demonstrates, in light of its interpretation of the terms of the ICA, that SNET's claims in Counts I and V could not mathematically be greater than 1% of its total charges to Global NAPS.

SNET denies these factual assertions and disagrees in several respects with Global NAPS's interpretation of the ICA.  It maintains that the special access circuits allegedly provisioned by Global NAPS pursuant to SNET's federal tariff are independent of the parties' obligations under the ICA, and, as such, its claims related to these circuits are not within the scope of the ICA's mandatory arbitration provision.

## II.    LEGAL STANDARD

The FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . .  shall be valid, irrevocable, and enforceable,

4

save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  The FAA reflects a "liberal federal policy favoring arbitration agreements."

Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24 (1983).  "Any

analysis of a party's challenge to the enforcement of an arbitration agreement must

begin by recognizing the FAA's strong policy in favor of rigorously enforcing arbitration

agreements." Doctor's Associates, Inc. v. Hamilton, 150 F.3d 157, 162 (2d Cir. 1998)

"The Second Circuit has established a two-part test for determining arbitrability of

claims not involving federal statutes: (1) whether the parties agreed to arbitrate disputes

at all; and (2) whether the dispute at issue comes within the scope of the arbitration

agreement." ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co., 307 F.3d

24, 28 (2d Cir. 2002)(citing Hartford Accident & Indem. Co. v. Swiss Reinsurance Am.

Corp., 246 F.3d 219, 226 (2d Cir.2001).  "Where . . . the existence of an arbitration

agreement is undisputed, doubts as to whether a claim falls within the scope of that

agreement should be resolved in favor of arbitrability."  Id. at 29.   Notwithstanding this

policy, "[a]rbitration is a matter of contract and a party cannot be required to submit to

arbitration any dispute which he has not agreed to submit." Howsam v. Dean Witter

Reynolds, Inc., 537 U.S. 79, 79 (2002).  "The purpose of the Federal Arbitration Act

'was to make arbitration agreements as enforceable as other contracts, but not more

so.'" McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co., 858 F.2d

825, 831 (2d Cir. 1988) (quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388

U.S. 395, 404 n. 12 (1967)).

Section 3 of Title 9 of the United States Code provides that, "upon being satisfied

that the issue involved in such suit or proceeding is referable to arbitration under [a

binding arbitration] agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ." 9 U.S.C. § 3. Typically, "the party seeking to compel arbitration has the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate." Tellium, Inc. v. Corning Inc., No. 03-civ-8487(NRB), 2004 WL 307238, at *5 ((S.D.N.Y. Feb. 13, 2004)(citing Progressive Cas. v. C.A. Reaseguradora Nacional, 991 F.2d 42, 46 (2d Cir.1993)). "In the context of motions to compel arbitration . . . the court applies a standard similar to that applicable for a motion for summary judgment. If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003) (internal citations omitted); see also Oppenheimer & Co., Inc. v. Neidhardt, 56 F.3d 352, 357 (2d Cir. 1995)(finding motion to compel arbitration was properly granted where defendants submitted evidence demonstrating that arbitration clause applied and plaintiff failed to impeach or effectively counter such evidence).

## III. DISCUSSION

The parties do not dispute that a binding agreement exists between them that contains an arbitration clause; they dispute whether the scope of that clause extends to the claims asserts in Counts I and V of SNET's complaint. The Second Circuit has adopted the following framework for determining whether a dispute falls within the scope of an arbitration clause:

> First, . . . a court should classify the particular clause as either broad or narrow. Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. Where the arbitration

6

> clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.'

Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc., 252 F.3d 218, 225 (2d Cir. 2001).

Global NAPS contends that the mandatory arbitration provision in section 10.6.2.1 is intended to apply broadly, while SNET argues that it is narrow in scope.  "In construing arbitration clauses, courts have at times distinguished between 'broad' clauses that purport to refer all disputes arising out of a contract to arbitration and 'narrow' clauses that limit arbitration to specific types of disputes." McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co., 858 F.2d 825, 832 (2d Cir. 1988.  "No fixed rules govern the determination of an arbitration clause's scope."  Louis Dreyfus,, 252 F.3d 218 at 225.  "[A] court must determine whether, on the one hand, the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause, or if, on the other hand, arbitration was designed to play a more limited role in any future dispute."  Id.

Here, the court concludes that the mandatory arbitration provision contained in 10.6.2.1 is a narrow arbitration clause.  When read in light of section 10.2.1, which indicates the parties' broad intention to resolve disputes according to the dispute resolution procedures, section 10.6.2.1 is clearly intended to apply only to a subset of the possible claims that fall under section 10.2.1, and the dispute resolution procedures as a whole contemplate litigation as an ultimate method of dispute resolution for the

7

claims described in section 10.2.1.  In addition, the existence of the 1% threshold in section 10.6.2.1 demonstrates that the parties did not intend for arbitration to "serve as the primary recourse for disputes connected to the agreement."  Id.   See McDonnell Douglas, 858 F.2d at 832 (finding clause was narrow where not of the sort where parties agree to submit any and all disputes to arbitration);  Ace Limited v. CIGNA Corporation, No. 00-CIV-9423(WK), 2001 WL 767015, at *3 (S.D.N.Y. July 6, 2001)(finding arbitration clause was narrow where it referred to particular subset of potential disputes and not all disputes arising out of the contract).   Thus, the arbitration provision of the ICA does not have the broad meaning that defendants urge.

Accordingly, the court must then resolve whether "the question at issue is on its face within the purview of the clause."  McDonnell Douglas, 858 F.2d at 833.  "In determining whether a particular dispute falls within the scope of a narrow and specific arbitration clause, the tone of the clause as a whole must be considered."  Id. (internal quotation marks omitted).  "Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview."  Louis Dreyfus, 252 F.3d at 224.

In addressing the applicability of the mandatory arbitration provision of the ICA to the particular claims at issue, the parties have raised several issues regarding the proper interpretation of the language of the ICA.  The parties also contest the application of that clause to the facts in the record regarding SNET's claims.  The court will consider the interpretive and factual questions in turn.

### A.     Breadth of Mandatory Arbitration Provision

SNET and Global NAPS offer differing interpretations of the breadth of the term "billing dispute" in the mandatory arbitration provision of section 10.6.2.1 of the ICA.

8

Global NAPS argues that the provision applies to all billing disputes "arising out of or related to" to the ICA.  SNET argues that the provision only applies to billing disputes arising directly under the ICA, and not billing disputes that may be merely "related to" the ICA.  This distinction is crucial because there is no evidence in the record, i.e., in the ICA or otherwise, indicating that the special access circuits at issue were ordered directly pursuant to ICA.  In other words, given the lack of evidence that the special access circuits were ordered "out of" the ICA, the mandatory arbitration provision must extend to "related" claims if the plaintiffs' claims are to be subject to it.

In support of its position, Global NAPS cites to the language of section 10.2.1 which states that the parties agree to use the described dispute resolution procedures with respect to any controversy or claim "arising out of or relating to this Agreement or its breach."  Def's Ex. 1.  It also finds support in the language of section 10.4, which provides that the service center dispute resolution method applies "with respect to any billing dispute arising out of or related to the Agreement."  Id.  It argues, accordingly, that the phrase "unresolved billing dispute" in section 10.6.2.1 includes billing disputes that either arise out of or are related to the ICA.

In response, SNET argues that the term "billing dispute" in 10.6.2.1 is restricted to billing disputes that actually arise under the ICA itself.  It finds support for this position in the language of 10.6.2.1, which provides that arbitration is mandatory for "[e]ach unresolved billing dispute involving one percent (1%) or less of the amounts charged to the Disputing Party under this Agreement in the state in which the dispute arises during the twelve (12) months immediately preceding receipt of the letter initiating Dispute Resolution under Section 10.3."  SNET argues that the phrase "under

9

this Agreement" is intended to modify "unresolved billing dispute," thus restricting the breadth of the clause. Global NAPS argues that "under this Agreement" only modifies "amounts charged to the Disputing Party," and thus the meaning of "billing dispute" is as broad as it is elsewhere in the ICA.

While the court has found that the arbitration clause as a whole is narrow in scope, the court is persuaded by the defendant that the meaning of "billing dispute" in section 10.6.2.1 has the same, broad meaning employed in the other provisions of the dispute resolution section of the ICA, namely, it includes both billing disputes "arising out of," and billing disputes "related to," the ICA.  The explicit reference to section 10.3 in section 10.6.2.1 suggests that "billing dispute" is to have the same meaning in 10.6.2.1 as it does in the preceding sections.  Accordingly, arbitration may be appropriate if the defendant demonstrates that the plaintiff's claims are "related to" the ICA, and the conditions for arbitration are otherwise met.

### B.      Meaning of 1% Threshold

The parties also dispute the correct interpretation of the 1% threshold contained in section 10.6.2.1.  Global NAPS argues that, for purposes of section 10.6.2.1, "each unresolved billing dispute" is defined on a per circuit, per month basis.  According to its understanding of "each unresolved billing dispute," each of the monthly bills that SNET has sent to Global NAPS for each of the 26 special access circuits represents a separate "unresolved billing dispute."  Moreover, Global NAPS argues, because it is not mathematically possible for any one of the 26 monthly bills to represent 1% or more of the total yearly sum of the bills, SNET's claims are necessarily subject to arbitration

because they fit within the 1% threshold, regardless of the amount disputed.[2]

Global NAPS argues that this position is supported by the "definition" of billing dispute in section 10.4.1.  Section 10.4.1 describes the procedure for the resolution of billing disputes under the "service center" approach.  It reads, in relevant part:

> In order to resolve a billing dispute, CLEC shall furnish . . . written notice of (i) the date of the bill in question, (ii) CBA/ESBA/ASBS or BAN number of the bill in question, (iii) telephone number, circuit ID number or trunk number in question, (iv) any USOC information relating to the item questions, (v) amount billed and (vi) amount in question and (vii) the reason that CLEC disputes the billed amount.

Def's Ex. 1, section 10.4.1.  Global NAPS asserts that, because this section is written in singular and not plural language, this section intentionally "defines" billing disputes on a per circuit, per month, individual basis, and, thus, the disputed amount cannot be considered in the aggregate when determining whether a particular billing dispute has overcome the 1% threshold in section 10.6.2.1.  SNET argues, in response, that section 10.4.1 does not serve to define the term "billing dispute," and that it should be accorded its ordinary meaning such that it could refer to the aggregate amount in dispute related to billing.

The court is not persuaded that section 10.4.1 serves to define "billing dispute" in

---

[2]Global NAPS offers a mathematical proof of this argument in its reply brief.  See Def's Reply, p. 8.  According to Global NAPS, if Global NAPS has procured 26 special access circuits from SNET, and if the amount due for each circuit is the same per month under the tariff, then the monthly amount due on any one circuit can only represent .3205% of the total yearly amount due, regardless of the actual amount due. ($1/(26 \times 12) = 1/312 = .3205\%$).  Under this theory, as long as Global NAPS has procured nine or more circuits from SNET, all of its billing disputes are subject to arbitration, regardless of the actual amount disputed.  In addition, this theory rests on the assumption that each billing dispute is for an identical amount.  This assumption is not supported by the allegations of SNET's complaint or by any other evidence.

section 10.6.2.1. in the manner that Global NAPS argues.  Significantly, the ICA contains a provision stating that "[u]nless the context clearly indicates otherwise, any term defined or used in the singular will include the plural." Def's Mem. of Law in Supp. of its Mot. to Dismiss, Ex. A., section 2.1.1.   Thus, the court cannot ascribe to the drafters of the agreement any specific intention due to the choice of the singular over the plural in section 10.4.1.  For example, "bill" in subsection 10.4.1(I) must be read as "bills."  Moreover, the overall thrust of section 10.6.2.1, read in the context of the entire dispute resolution provision, suggests that the 1% threshold is intended to commit only smaller billing disputes to mandatory arbitration, relative to the amount transacted between the parties, rather than the majority of disputes, without regard to the amount at issue, as Global NAPS' interpretation would entail.

Accordingly, the 1% threshold has the meaning ascribed to it by SNET.  Only billing disputes that are, in the aggregate, less than 1% of the total amount billed by SNET to Global NAPS over the 12 months preceding the initial notice of the dispute are subject to mandatory arbitration under section 10.6.2.1.

### C.    Factual Disputes

Having resolved the interpretive issues surrounding the mandatory arbitration provision of the ICA, the court can now consider whether SNET's claims are, on their face, within the purview of the arbitration agreement.  Given the preceding discussion, the question, under section 10.6.2.1,  is whether SNET's claims regarding payment for its special access circuits are 1) arise out of, or are related, to the ICA, and 2), for an amount less than 1% of the total charged by SNET to Global NAPS under the ICA.

Generally, where, as here, the scope of an arbitration clause is narrow, a claim

12

must "on its face" be within the purview of the arbitration clause.  Louis Dreyfus, 252

F.3d 218, 228-29 (citing Rochdale Village, Inc. v. Pub. Serv. Employees Union, 605

F.2d 1290, 1295 (2d Cir. 1979)).  Unlike the test for broad arbitration clauses, it is not

enough for a claim to "touch matters" relating to the construction of the agreement that

contains the arbitration clause.  See, e.g., Collins & Aikman Products Co v. Building

Systems, Inc., 58 F.3d 16, 21 (2d Cir. 1995).  In determining whether a particular claim

falls into the scope of an arbitration agreement, the court looks to "the factual allegation

in the complaint rather than the legal causes of action asserted."  Smith/Enron

Cogeneration Limited Partnership, Inc. v. Smith Cogeneration International, Inc., 198

F.3d 88, 99 (2d Cir. 1999).

       The court cannot conclude from SNET's complaint alone that the claims in Count

I and V of its complaint relate to the ICA.  Cf. McMahan Securities Co. v. Forum Capital

Markets L.P., 35 F.3d 82, 88 (2d Cir. 1994)(finding that plaintiffs' allegations themselves

demonstrate that the claims are covered by the applicable arbitration agreement).  As

described above, SNET alleges that, separate from any arrangement involving the ICA,

Global NAPS orders facilities according to SNET's federal tariff and failed to pay for

them. Complaint, ¶¶ 11-15.  While these allegations can be described as a billing

dispute, the allegations themselves do not demonstrate that the billing dispute is related

to the ICA or that it is within the 1% threshold of the arbitration clause.

       Nonetheless, Global NAPS argues, the claims are properly arbitrable because

they involve the same facilities (i.e., the meet point trunks) that are in issue in SNET's

other claims, and are thus at least related to the ICA.  It argues, for example, that "what

is not fully articulated by Plaintiff, but is nowhere disputed, in fact is that the 'special

13

access circuits' referenced in Counts I and V of the Complaint and the 'meet point

trunks' referenced in the remainder of the Counts are the same facilities."  Def's Mem.

of Law in Supp. of Its Mot. to Comp. Arb., p. 3.  Global NAPS has not produced any

evidence extrinsic to the pleadings, such as affidavits or other documents, to provide an

basis for this assertion.  Instead, it relies on what it deems admissions and concessions

by SNET in its own pleadings for support.

However, SNET has not made the concessions that Global NAPS ascribes to it.

It did not, for example, in its Memorandum of Law in Opposition to Defendant's Motion

to Dismiss, "reference[] the ICA as pertinent to the resolution of the disagreement," nor

"rel[y] on the language of the [ICA] to support its contention that Global NAPS is liable

under the tariff."  Def's Mem. of Law in Supp., p. 3, 10.  Instead, in its opposition to

Global NAPS's motion to dismiss, and consistent with its position here, SNET merely

argued that, despite Global NAPS's continued contention to the contrary, the terms of

the ICA have nothing to do with Global NAPS's obligations under the federal tariff.

Thus, Global NAPS's assertions lack evidentiary support.  See Oppenheimer & Co.,

Inc. v. Neidhardt, 56 F.3d 352, 357 (2d Cir. 1995)(holding that, to create an issue of fact

with regard to right of arbitration, it is necessary to make a showing of evidentiary facts).

Stepping back from Global NAPS's specific assertions, it appears Global NAPS'

position is that it does not owe the sums that SNET claims for its alleged use of the

special access circuits because, under its interpretation of the ICA, those costs are to

be borne by SNET.  SNET argues in response that Global NAPS purchased the special

access circuits from SNET at least in part to carry out its obligations under the ICA, but

that it was not required to purchase these circuits from SNET for this purpose, and that

14

it could have chosen to purchase circuits from a third-party or build them itself.  Global NAPS' invocation of the ICA is a defense to SNET's claims, which do not necessarily involve the ICA.   In other words, SNET's claims are not "on their face" billing disputes arising out of or related to the ICA, but, rather, even on Global NAPS' version of the facts, involve collateral agreements that are outside the purview of the narrow arbitration clause.[3]  See Louis Dreyfus, 252 F.3d at 228.

Accordingly, Global NAPS' motion to compel arbitration is DENIED.

### D.    Subject Matter Jurisdiction

Global NAPS has also moved to dismiss this case for lack of subject matter jurisdiction, presumptively arguing  that "once the Court stays Counts I and V in favor of arbitration . . . this entire action will be stayed."  Def's Mem. of Law. in Supp. of Mot. to Compel Arb., p. 13.  The court has not stayed Counts I and V in favor of arbitration. Nor has the court stayed SNET's other claims in their entirety; it only stayed those claims to the extent that they involved IP-related transmissions.  See October 25, 2005 Ruling, p. 17.  Nor, in any event, does staying an claim divest this court of jurisdiction over the proceedings.  Accordingly, Global NAPS's motion to dismiss for lack of subject matter jurisdiction is DENIED.

## IV.    CONCLUSION

For the forgoing reasons, Global NAPS's motion to compel arbitration and

---

[3]Unlike in Verizon New York Inc. v. Broadview Networks, Inc., 781 N.Y.S.2d 211 (N.Y.Sup. Ct. 2004), which Global Naps cites for support, Global NAPS has not demonstrated that the ICA here contains a provision that references SNET's federal tariffs and provides that Global NAPS will purchase services at the rates established in the tariff.  Id. at 215.  The federal tariff here is not incorporated into the ICA as it is in Verizon.

motion to dismiss for lack of subject matter jurisdiction [Doc. No. 56] is DENIED.

SNET's motion for leave to file a surreply [Doc. No. 74] is GRANTED.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 27th day of April, 2006.

_____       /s/ Janet C. Hall_____
                                       Janet C. Hall
                                       United States District Judge

16