UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY, | : : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| v. | : : | 3:04-cv-2075 (JCH) |
| GLOBAL NAPS, INC., | : | |
| Defendant. | : | OCTOBER 23, 2006 |

**RULING ON PLAINTIFFS' MOTION FOR RECONSIDERATION [Doc. No. 237]**

The plaintiff, the Southern New England Telephone Company ("SNET"), has brought this action against the defendant, Global Naps, Inc. ("Global"), for damages and injunctive relief arising out of the use of SNET's telephonic networking facilities by Global.  SNET asserts claims for the breach of applicable federal and state tariffs and for breach of an interconnection agreement between the two parties.  SNET also asserts claims for the violation of the Connecticut Unfair Trade Practices Act ("CUTPA") against Global.

On May 31, 2006, this court entered an Order (Doc. No. 152) granting SNET's Motion for Prejudgment Remedy (Doc. No. 63) pursuant to Federal Rules of Civil Procedure Rule 64 and Connecticut General Statutes § 52-278a et seq.  The Order entitled SNET, *inter alia*, to attach or garnish Global's real or personal property in furtherance of SNET's right to secure the sum of $5, 250, 000.00 from Global.  On October 5, 2006, the court ruled that the prejudgment attachment did not grant SNET the right to seize and remove certain equipment of Global to secure the prejudgment remedy.  Tr. of Oct. 5, 2006 Conference (Doc. No. 240).  In so ruling, the court expressed reservations about its conclusion and invited further briefing on the matter

via a motion for reconsideration by SNET.

SNET now brings this Motion for Reconsideration (Doc. No. 242) requesting that the court reverse its prior decision and allow it to take physical possession of certain items of Global's equipment. For the following reasons, the motion is granted.

**I.    STANDARD**

The Second Circuit has held that "[t]he standard for granting [a motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked matters; in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir.1995) (citations omitted). There are three grounds that justify granting a motion for reconsideration: (1) an intervening change in controlling law; (2) the availability of newly discovered evidence; and (3) the need to correct clear error or prevent manifest injustice. Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir.1992). That the court overlooked controlling law or material facts may also entitle a party to succeed on a motion to reconsider. Eisemann v. Greene, 204 F.3d 393, 395 n. 2 (2d Cir.2000) (per curiam) ("To be entitled to reargument, a party must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion.") (citations omitted).

## II.  DISCUSSION[1]

Absent a limited number of exceptions, settled Connecticut law holds that:

> it is essential to the validity of an attachment of tangible personal property that the attaching officer take the same into his physical possession, and if he permits it to remain in the possession of the defendant the lien of the attachment is lost and the property is subject to the attachment of other creditors.

Gray v. Bracken, 107 Conn. 300, 302 (1928).  Connecticut General Statutes § 52-287 provides for one such exception when a party attempts to attach the fixtures of a telephone company.  In relevant part, the statute states that the fixtures of a telephone company,

> including its wires, posts, crossbars, lamps, switchboards, piers and abutments, may be attached in the same manner and with the same legal effect as real estate in civil actions, by the officer lodging in the Office of the Secretary of the State a certificate that he has made such attachment.

Conn. Gen. Stat. § 52-287.  By its terms, the statute protects the customers of telegraph, telephone or electric companies from the severe disruption that would ensue if an adverse party were to take physical possession of the fixtures necessary to deliver the essential services that these entities provide.  Clear though its purpose may be, the section does not provide a definition of "telephone company."

On October 5, 2006, the parties brought to the court's attention that SNET intended to take physical possession of certain items of Global's property in order to effectuate the prejudgment remedy issued by this court.  Global vehemently objected

---

[1] In light of its prior Ruling on October 26, 2005 (Doc. No. 38) denying Global's Motion to Dismiss (Doc. No. 11), the court's May 31, 2006 Order (Doc. No. 152, amended on Oct. 3, 2006 (Doc. No. 239)) granting SNET's Motion for Prejudgment Remedy (Doc. No. 63), and the extensive procedural history of this case, the court assumes the parties' familiarity with the basic facts underlying this action.

and requested that the court intervene. The next day, the court conducted an emergency hearing on the record to resolve the issue.

At that hearing, Global argued that, pursuant to section 52-287, SNET could not physically possess its equipment because Global was a "telephone company" within the meaning of section 52-287. SNET countered that Global was not a "telephone company" as Connecticut General Statutes § 16-1(23) defines that term. According to SNET, the definition of "telephone company" contained in Title 16 was the only relevant definition of this term in the General Statutes. As such, the court could rely on Title 16 to define "telephone company" for the purposes of section 52-287. Title 16 defines a "telephone company" as "a telecommunications company that provides one or more noncompetitive or emerging competitive services, as defined in section 16-247a." Conn. Gen. Stat. 16-1(23). However, Title 16 states that the definitions contained therein are to be used in construing Title 16 and specific other chapters that do not include section 52-287. Conn. Gen. Stat. § 16-1(a).

Key to the court's determination of this issue was Global's representation that the Connecticut Department of Public Utility Control ("DPUC") recognized it as telephone company by virtue of certifying Global as a "telecommunications provider" under Connecticut General Statutes § 16-1(38).[2] Based on this, the court prevented SNET from taking physical possession of Global's equipment due to its finding that Global was a "telephone company" within the meaning of Conn. Gen. Stat. 16-1. However, the court invited SNET to move to reconsider so that the court could address the issue after

---

[2] "'Certified telecommunications provider' means a person certified by the department to provide intrastate telecommunications services." Conn. Gen. Stat § 16-1(38).

-4-

briefing.

### A. Global's Status as a Telephone Company Under Conn. Gen. Stat. § 16-1.

At the court's invitation, SNET now comes forward with evidence and authority that the court did not have the opportunity to consider in its original consideration of this matter.  Of most importance is the fact the DPUC does not recognize Global NAPS as a telephone company.  Quite the opposite, in fact.  As Global admits in its most recent annual report to the DPUC, the DPUC certified Global as a "Competitive Telecommunications Provider."  Global NAPS Annual Report (Dec. 31, 2005), Ex. B to Motion for Reconsideration (Doc. No. 237).  A competitive service provider cannot be a telephone company under Title 16.  Conn. Gen. Stat. § 16-1(23).

Given SNET's submission, this court does not find that Global provides a "noncompetitive or emerging competitive service" under Conn. Gen. Stat § 16-247a. See Conn. Gen. Stat. § 16-247a(4) (defining "noncompetitive service" and cross-referencing section 16-247f); Conn. Gen. Stat. § 16-247a(3) (defining "emerging competitive service" and cross-referencing section 16-247f).  The court therefore concludes that Global is not a telephone company as section 16-1(23) defines that term.

### B. Global NAPS Status as a Telephone Company Under Conn. Gen. Stat. § 52-287.

Rather than press the argument that it is a telephone company under section 16-1(23), Global asserts that section 16-1 is inapplicable.  Further, Global contends that the purpose of section 52-287 implicitly recognizes Global as a telephone company.

The court rejects both contentions.

### 1. The Applicability of Conn. Gen. Stat. § 16-1.

One of Global's rationales for why the court should reject the definition of "telephone company" in section 16-1 when determining whether it is a telephone company under section 52-287 is the fact that the General Statutes contain "multiple definitions" under which Global does qualify as a telephone company. Def. Opp. at 6. To this end, Global highlights that the DPUC issued it a "certificate of public convenience and necessity" that allows Global to provide telecommunications services in Connecticut. Id. at 4. To provide these services, Global "has established a Point of Interconnection with SNET" as well as "installed telecommunications equipment necessary to provide its services in locations all over the state." Id. Global also notes that SNET uses some of the same equipment that Global does in providing customers with telecommunications services. Notably, Global does not specify the telecommunications services to which it refers.

These characteristics, according to Global, qualify it as a telephone company under the multiple, broader definitions of that term contained in the General Statutes. Curiously, Global only cites this court to one "broader" definition of "telephone company," contained in Connecticut General Statutes § 28-25(12). Under that section, a "telephone company"

> includes every corporation, company, association, joint stock association, partnership or person, or lessee thereof, owning, leasing, maintaining, operating, managing or controlling poles, wires, conduits or other fixtures, in or over any public highway system or street, for the provision of telephone exchange and other systems and methods of telecommunications and services related thereto in or between any or all of the municipalities of this state.

Conn. Gen. Stat. § 28-25(12). Leaving aside the question of whether Global is even properly considered a telephone company under this definition, this section explicitly concerns itself only with emergency telecommunications and Connecticut's enhanced 9-1-1 telephone system. Conn. Gen. Stat. § 28-25. It is undisputed that Global does not provide any 9-1-1 or other emergency telecommunications services. As a result, the court can find no basis for holding that Global is a "telephone company" under the "multiple" definitions provided in the General Statutes.

Global also argues that sections 16-1 and 52-287 serve different ends, which should prevent the court from relying on section 16-1 in interpreting section 52-287. The explicit goals of Title 16, in Global's view, principally involve supporting the development of high quality telecommunications services to the residents of Connecticut. See Conn. Gen. Stat. § 16-247a(a). Furthermore, Global argues that the purpose of section 52-287 is to "ensure continued telecommunications service." Def. Opp. at 8. Global then concludes that it would be illogical to incorporate Title 16's goal of ensuring quality telecommunications service in order to craft a section 52-287 definition of "telephone company" that would terminate telecommunications services to numerous customers. Id. at 10.

The court finds that Global's argument unjustifiably attributes to section 52-287 a general concern with protecting "telecommunication services." To the contrary, section 52-287 is not at all concerned with ensuring the continued provision of "telecommunications service" by every conceivable "competitive telecommunications provider." As discussed above, section 52-287 only protects the fixtures of telegraph, telephone, electric light, and power companies from physical attachment. Conn. Gen.

Stat. § 52-287. Regulatory history teaches that these three industries were traditionally controlled by monopolies. Indeed, as Global notes, the legislature added section 52-287 in 1949, when there was only one telephone company operating in Connecticut. Understood in this historical context, one can easily discern a legislative concern with the prospect that allowing an outside party to take physical possession of a telephone company's fixtures could rob an entire municipality of telephone service.

That the telecommunications industry has significantly advanced since 1949 is beyond reasonable dispute. Title 16 clearly reflects the legislature's attempts to deal with these changes. However, while the legislature has subsequently seen fit in Title 16 to define terms like "competitive service" - the only type of telecommunications service that Global appears to provide - it has never incorporated such terms into section 52-287. A straightforward inference from this omission is that, while the legislature recognized in Title 16 that much has change, it concluded in section 52-287 that much has stayed the same. For present purposes, if the legislature has not deemed it appropriate to protect the property of competitive service providers from physical attachment in section 52-287, it may be because the legislature intended to hew the traditional line of limiting section 52-287 to noncompetitive, or monopoly-like, entities.

Considering the services that Global actually provides in Connecticut only strengthens this inference. Global receives dial-up Internet access calls made by non-Global telecommunications providers to Global's Internet Service Provider ("ISP") customers and delivers so-called "IP-enhanced" calls to SNET, which calls SNET then provides to its customers. The latter, as Global admits, does not even constitute a telecommunications service. The former has nothing to do with telephones; rather, it is

simply a means by which customers can access the Internet. Preventing Global from conducting business in Connecticut, then, while certainly an inconvenience to its customers, would do nowhere near the damage of incapacitating a noncompetitive service provider like SNET. As Global is a competitive service provider, it could simply be replaced by another competitive service provider.

Viewed from this perspective, using section 16-1's definition of "telephone company" is entirely consistent with section 52-287's use of the term: it ensures that noncompetitive services are not disrupted by physical attachment, while leaving competitive service providers subject to the normal requirements of Connecticut attachment law. The court therefore concludes that the definition of "telephone company" in Title 16 is applicable to section 52-247. See Link v. City of Shelton, 186 Conn. 623, 627 (1982) (holding that a court "may look to the meaning given the same phrase in unrelated statutes . . . and consider that where the legislature uses the same phrase it intends the same meaning.")

    2.    Section 52-287 and the meaning of "telephone company."

Even if this court found that section 16-1 cannot be applied to section 52-287, Global does not qualify as a telephone company under an independent interpretation of section 52-287. According to Global, the purpose of section 52-287 is to "protect[] customers from losing services." Def. Opp. at 5. Therefore, Global must be considered a telephone company to the extent that taking its equipment into physical possession will prevent customers from receiving the services that it provides. For the reasons state above, the court rejects this assertion. Although section 52-287 is concerned with protecting consumers from the interruption of certain services, it is not concerned with

protecting consumers from interruption of the services that Global provides.

### C. The Appropriateness of Seizure with Respect to the Purposes of Attachment and Prejudgment Remedies

Global next argues that physical seizure conflicts with the purposes of prejudgment remedies. In its view, "attachment is merely a charge upon the property . . . and . . . do[es] not affect the title or right of possession of the judgment debtor." Def. Opp. at 12 (citing All Seasons Services, Inc. v. Guildner, 89 Conn.App. 781, 786 (2005) (quotations omitted)). Further, Global asserts that SNET is only entitled to obtain an inchoate loan on its property pursuant to the prejudgment remedy. Id. (citing Shawmut Bank v. Brooks, 46 Conn.App. 399, 410 (2005)).

The cases that Global marshals to support this proposition both deal with attempts to attach real property. See Guildner, 89 Conn.App. at 786; Brooks, 46 Conn.App at 410. But here, Global is seeking to prevent the physical seizure of its personalty, rather than real property. See generally Petco Insulation Co., Inc. v. Crystal, 231 Conn. 315, 320-325 (1994) (discussing meaning of "tangible personal property", as distinguished from "services" under Connecticut law). The case law in Connecticut is clear: the attachment of personal property must be effected by physical possession. See Gray v. Bracken, 107 Conn. 300, 302 (1928) (discussing necessity of physical attachment for personal property).

### IV. CONCLUSION

For the forgoing reasons, SNET's Motion for Reconsideration (Doc. No. 237) is GRANTED. There is now no bar to the lawful, physical seizure by SNET of Global's personal property in Connecticut.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 23rd day of October, 2006.


                /s/ Janet C. Hall
                Janet C. Hall
                United States District Judge