UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY, | : : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| v. | : | 3:04-cv-2075 (JCH) |
| | : | |
| GLOBAL NAPS, INC., | : | |
| Defendant. | : | MARCH 26, 2007 |

## RULING ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Doc. No. 281], DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Doc. No. 287], and DEFENDANTS'S MOTION TO SUPPLEMENT SUMMARY JUDGMENT RECORD [Doc. No. 369]

The plaintiff, the Southern New England Telephone Company ("SNET"), brings this action against the defendant, Global Naps, Inc. ("Global"), for damages arising from Global's alleged breach of applicable federal and state tariffs and for breach of an interconnection agreement between the two parties. SNET also asserts claims for the violation of the Connecticut Unfair Trade Practices Act ("CUTPA") against Global NAPS.

SNET has moved for partial summary judgment on Count I of the Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure. Count 1 asserts damages from Global's alleged breach of SNET's federal tariff with respect to twenty-six telecommunications circuits (DS3s, SS7s, and a DS1) provided to Global by SNET. Global has moved for partial summary judgment both with respect to twenty-one of the telecommunications circuits (DS3s) at issue and SNET's CUTPA claim in Count 5. Global has also moved to supplement the summary judgment record based on newly discovered evidence produced in an unrelated lawsuit involving Global.

For the reasons that follow, SNET's motion for partial summary judgment (Doc.

No. 281) is GRANTED.  Global's motion for partial summary judgment (Doc. No. 287) is DENIED, and Global's motion to supplement the summary judgment record (Doc. No. 369) is GRANTED.

## I.    STANDARD OF REVIEW

In a motion for summary judgement, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

On cross motions for summary judgment, the court cannot grant summary judgment "unless one of the moving parties is entitled to judgment as a matter of law

upon facts that are not genuinely in dispute." <u>Heyman v. Commerce & Indus. Ins. Co.</u>, 524 F.2d 1317, 1320 (2d Cir.1975).

## II.    FACTS

SNET is a Connecticut corporation with its principal place of business in New Haven, Connecticut.  Global is a Delaware corporation with its principal place of business in Quincy, Massachusetts.  Global NAPS has been a licensed telecommunications carrier in Connecticut since 1999.

In 2000, Global requested that SNET negotiate an interconnection agreement under sections 251 and 252 of the Telecommunications Act of 1996 ("1996 Act"), for the purpose of establishing the terms and conditions under which the parties would physically interconnect their networks at a "point of interconnection," or "POI."  The parties were unable to agree upon language for a number of contract sections.  Consequently, Global petitioned the Connecticut Department of Public Utility Control ("DPUC") to arbitrate the disputed issues pursuant to section 252 of the 1996 Act.

The contract section relevant to this ruling, which Global requested that the DPUC arbitrate, concerned the appropriate contract language for the parties' exchange of "foreign exchange" ("FX") traffic.  Global provides its customers with FX service in order to allow those customers to be assigned to a telephone number in a location that is different from the customer's actual location.  FX service allows an Internet Service Providers ("ISP") to establish a single point of presence that can be reached by dialing a local number regardless of the physical location of the Internet subscriber.

The source of the parties' disagreement concerned who would bear the physical and financial responsibility for the facilities necessary to transport Global's FX traffic.

3

SNET proposed that section 5.4.6 of the Interconnection Trunking Requirements ("ITR") Appendix concerning Global's FX traffic state: "[i]f either Party uses its NXX Code[1] to provide [FX] service to its customers outside of the geographic area assigned to such code, that Party shall be solely responsible to transport traffic between its [FX] service customer and such code's geographic area."  SNET Local Rule 56(a)(1) Statement at 9.[2]  Global proposed that section 5.4.6 should state: "[e]ach party is responsible for the transportation and hand-off of traffic consistent with other provisions of this agreement." Global Request for Modification, DPUC Doc. 01-01-30 (App. Tab K to SNET Memo. in Support).  In addition, Global proposed that section 2.4 of the ITR state: "[e]ach party is solely responsible for the facilities to its side of the negotiated POI(s) and may use any method of Interconnection described in this Appendix."  Id.

On June 12, 2002, the DPUC ordered that SNET's proposed language for ITR § 5.4.6 be included in the parties' interconnection agreement ("ICA").  In September 2002, Global and SNET executed an interconnection agreement that was consistent with the DPUC's ruling.

Around October 2002, Global and SNET completed construction of the physical interconnection between their networks.  This involved both parties deploying an underground fiber optic cable between SNET's New Haven tandem office and a Global equipment hut situated approximately 1, 700 feet away.  On their respective ends of the fiber optic cable deployed between SNET's New Haven tandem office and Global's

---

[1]An NXX code is the first three digits of a seven-digit telephone number.  Each NXX code is associated with a particular local calling area.

[2]Cited hereinafter as "SNET L.R. 56(a)2 at ¶ __."

New Haven equipment hut, each party deployed electronic equipment to establish an "OC-48." This electronic equipment gave the fiber optic cable a potential carrying capacity of 48 DS3s. The parties then designated the Global manhole between SNET's New Haven tandem office and Global's New Haven hut as the POI on the OC-48, which serves as the physical location at which Global's and SNET's networks interconnect.

In October and November of 2002, Global submitted orders to SNET to establish a DS1 circuit and four SS7 signaling links. Two of the SS7 signaling links travel over the DS1 to connect Global's signaling system to SNET's signaling system. Signaling links carry messages associated with calls between signaling databases. These messages allow switches to "talk" to one another to determine how to set up and terminate the communications path for a particular call. In response to Global's requests, SNET provisioned the DS1 and SS7s.

In December 2002, Global submitted orders for six DS3 circuits to carry traffic from various SNET tandem locations to either, as SNET asserts, the parties' POI or, as Global asserts, to the SNET New Haven tandem office. See SNET L.R. 56(a)(1) at ¶ 59; Global L.R. 56(a)(2) at ¶ 59. The order forms indicate that SNET provided the circuits Global requested. Between March 2003 and April 2005, Global submitted orders for fifteen additional DS3 circuits. The order forms for these circuits indicate that SNET provisioned the requested circuits.

For each month since SNET claims to have provisioned the circuits in question, it billed Global at rates established by SNET's federally filled tarrif. SNET claims that it billed Global for the four SS7 signaling links pursuant to section 17.2.1 of SNET's federal tariff. The relevant portion of the section states:

5

> Dedicated Signaling Transport (DST) is a Switched Access service which
> provides interconnection to the Telephone Company Channel Signaling Network
> . . . using a dedicated two-way signaling path between a customer designated
> premises and a Telephone Company Signal Transfer Point (STP). DST uses a
> dedicated signaling link and a dedicated STP port. The signaling link provides
> the connection from the customer designated premises to the Telephone
> Company STP. The STP port provides the customer access to the Telephone
> Company SS7 network.

SNET Tariff F.C.C. No. 39 at § 17.2.1. SNET further claims that it billed Global for the

DS! and DS3 transport circuits under section 7.1 of its federal tariff. This section, which

pertains to facilities that provide "special access" services, states:

> Special Access Service provides a channel, or transmission path, to connect two
> or more customer premises or to connect a customer premises to a Wide Area
> Telephone Service (WATS) servicing office or Telephone Company location
> where multiplexing functions are performed.

Id. at § 7.1. Global has refused to pay any of the charges billed by SNET for the

circuits at issue.

## III. DISCUSSION

In moving for summary judgment, SNET asserts that it was not responsible for

providing any of the twenty-six circuits in question, that it provided the circuits to Global

in accordance with the terms of SNET's federal tariff, and Global is liable to SNET for

the tariff rates applicable to the circuits. In its summary judgment motion with respect to

Count 1 of the Complaint, Global asserts that it is not liable for the 21 DS3 facilities that

transport Global traffic between SNET's tandem office in New Haven and other SNET

locations in Connecticut because these circuits were not provisioned according to

SNET's tariff. As to SNET's CUTPA claim in Count 5 of the Complaint, Global argues

that it is entitled to summary judgment because the mere breach of an obligation to pay

a monetary debt does not rise to the level of an unfair trade practice.

## A.   SNET's Ability to Maintain a Theory of Recovery Under Its Tariff

SNET first asserts that the ICA imposed no obligation on it to pay for any of the circuits at issue.  SNET then notes that the ICA contains no provision under which Global could have ordered these facilities from SNET.  Thus, SNET concludes that when Global chose to order the circuits in question from SNET, SNET's only means of providing those circuits was pursuant to its federal tariff.  In response, Global first contends that, as to the special access circuits, SNET's federal tariff theory of recovery is really an ICA contract claim in disguise.  Since the ICA provides the true basis for SNET's claims, rather than SNET's tariff, Global asserts that SNET cannot maintain a cause of action under its tariff.  Instead, Global suggests that SNET could only prevail by bringing a breach of contract claim under the ICA.

To support its contention, Global argues that, under filed rate doctrine, SNET is forbidden from charging "rates for its services other than those properly filed with the appropriate regulatory authority" via a tariff.  Global Opp. at 5 (citing <u>Fax Telecommunicaciones, Inc. v. AT&T</u>, 138 F. 479, 488 (2d Cir. 1978).  Thus, if Global did not order circuits under SNET's tariff, or SNET did not provide the circuits under its tariff, SNET cannot use the ICA to convert these circuits into special access services. Global Opp. at 5.

Global then cites to the recent decision by the Eastern District of New York in <u>Verizon New York, Inc. v. Global NAPS</u>, 463 F.Supp.2d 330, 347 (E.D.N.Y. 2006).  In <u>Verizon</u>, Verizon argued that its interconnection agreement with Global required Global to provide facilities to transport certain types of traffic from Global's customers, to the Global network, and on to Verizon's side of the interconnection.  <u>Id.</u> at 345-46.  The

Verizon court found that Verizon's position so intertwined its tariff claim with its other contract claims that the tariff took on a "subsidiary nature." Id. at 347. Judge Vitaliano held that a carrier such as SNET cannot prevail on summary judgment unless it demonstrates that the services at issue were ordered "pursuant to the tariff alone, not just that the tariff served as a pricing mechanism." Id. at 347. For Judge Vitaliano, Verizon's contention that "Global's obligation to pay for the services it ordered came from the agreements" and that the tariff merely provided the applicable rate served to "torpedo" Verizon's motion for summary judgment. Id.

SNET attempts to avoid the logic of Verizon by seizing on the fact that it is not claiming that Global's "obligation to pay" comes from the ICA. Instead, SNET contends that, given the terms of the ICA, Global's obligation to pay could only come from SNET's tariff. As discussed above, it does appear that Verizon made a claim similar to SNET's in Verizon. See Verizon 463 F.Supp.2d at 345-56. However, the court the court agrees with SNET that the cases are distinguishable.

Before finding that Verizon's tariff claim was merely subsidiary, the Verizon court referenced a prior proceeding between the parties before the FCC. Id. at 347. At that proceeding, Verizon apparently argued that "its claim for payment of the transport provisions ordered by Global arises not as a matter of tariff alone *but because Global had agreed to such charges in the interconnection agreements and in state memoranda of understanding."* Id. (emphasis added). That circumstance is clearly not present in the instant case. There is no evidence in the record, and SNET does not contend, that Global agreed in the ICA to pay the tariffed rates for special access services. Indeed, SNET's tariff theory is perfectly distinguishable from the Verizon situation because the

8

parties' ICA is silent both on the issue of how Global was to fulfill its obligation to

provide the equipment needed to carry its FX traffic, and on the issue of how much

Global would pay for the relevant special access circuits.  The only remaining

questions, then, are whether the ICA assigned to Global, rather than SNET,

responsibility for the circuits in question, and whether those circuits are actually covered

by SNET's federal tariff.  See Id. at 348.[3]  The court addresses these issues in turn.

### B.    SNET's Responsibilities for Providing Facilities Under the ICA

To establish that it had no obligations under the ICA to provide the circuits in

question, SNET subdivides these circuits into three general categories: 1) the fifteen

DS3 facilities that exclusively transport Global's FX traffic; 2) the DS1 and four SS7

signaling facilities; and 3) the six DS3 facilities that Global used to provide its

"Enhanced Service Providers" ("ESP") with "outbound" service from Global ESP

customers to SNET end-users.  As to the fifteen DS3 facilities, SNET relies on section

---

[3]Even if the facts of this case were on all fours with the Verizon decision, the court disagrees with its treatment of the filed rate doctrine.  As discussed, the Verizon court takes pains to distinguish Verizon's ICA and contract theories, in addition to determining whether Global had notice that it was ordering services under Verizon's tariff.  See id. at 347 (noting that "[t]here is no proof offered by Verizon that Global ever expressly stated orally or in writing that it was purchasing provisions of the tariff without regard to anything else).  However, if the service at issue is specifically covered by a tariff, questions of whether the service was also covered in a contract between the parties or whether the allegedly delinquent party had notice that it was ordering tariffed services become irrelevant.  American Telephone and Telegraph Co. v. Central Office Telephone, 524 U.S. 214, 222 (1998).  Federal tariffs "bind both carriers and [customers] with the force of law."  ICOM Holding, Inc. v. MCI Worldcom, 238 F.3d 219, 221 (2d Cir. 2001).  Consequently, parties cannot vary the rights and liabilities covered by the tariff through contract, see Central Office, 524 U.S. at 227, and it has long been the case that ignorance of a properly filed tariff is no excuse for paying or charging anything other than the tariff rate for a tariff service.  AT&T Corp. v. American Telephone and Telegraph Co., 138 F.3d 46, 59 (2d Cir. 1998) (citing Louisville & Nashville R.R. Co. v. Maxwell, 237 U.S. 94, 97 (1915).  Global's knowledge of both Verizon's and SNET's filed rates should be "conclusively presumed," regardless of how the parties managed their interconnection agreements and service orders.  See Fax Telecommunicaciones 138 F.3d at 490.

9

5.4.6 of the ITR to argue that Global was responsible for transporting FX traffic between Global's FX customers and the geographic area of the codes Global assigned to those customers. See ITR § 5.4.6. SNET asserts that it had no obligation under the ICA for the signaling facilities because the ICA does not cover such facilities, and the parties did not agree to an "SS7 Appendix" in the interconnection agreement. As to the DS3's that Global used for ESP traffic, SNET contends that the ICA does not impose obligations for SNET to provide facilities for this traffic because the ICA only governs "local telecommunications" traffic and "exchange access" traffic. ESP traffic is neither.

Global partially counters SNET's position with respect to the fifteen DS3s dedicated to FX traffic by arguing that seven of those facilities do not qualify as FX circuits because they originate and terminate in the same local calling area. For the signaling facilities, which do not actually transport traffic, Global argues that, since these circuits do not fall under the ITR's FX provision, SNET must pay for them. According to Global, SNET's duty to pay is embodied in the ICA's general rule that "[e]ach Party is responsible for the facilities to its side of the [negotiated] POI(s) . . . " NIM App., § 2.4. Global lastly argues that the six DS3 circuits, which carry ESP traffic from SNET's tandem office in New Haven to SNET's tandem office in Hartford, are SNET's responsibility because "most and perhaps all of the DS-3s . . . are devoted to carrying non-FX terminating traffic." Global Opp. at 24.

1. ICA Liability for the DS3's Originating and Terminating in Same Local Calling Area

Global's first claims that when it uses the DS3's that both originate and terminate in the New Haven calling area, "it assigns New Haven NXXs because those are local

10

numbers to New Haven callers." Global Opp. at 18. Hence, in Global's view, it is "indisputably not issuing NXXs outside of the geographic area assigned to such code." Id. Global's argument is without merit. When Global proffers that "it assigns New Haven NXXs," it conveniently omits to clarify to what it assigns the NXX code. Nothing in the record suggests that Global assigns NXX codes to the DS3 circuits themselves, and Global could not assign NXX codes to New Haven end uses because these end users are SNET customers. Rather, Global provides NXX codes to its own customers, and those NXX codes correspond to a particular geographic area. See SNET L.R. 56(a)(1) Stat. at ¶¶ 6, 28. There is no dispute that Global has no ISP customers who actually reside in the New Haven local calling area. Global L.R. 56(a)(2) Stat. at ¶ 88. When Global assigns its non-New Haven customers New Haven NXXs, then, it necessarily "provide[s] foreign exchange service to its customers outside of the geographic area assigned to [the New Haven] NXX code." ITR App. § 5.4.6. Thus, the mere fact that these DS3s originate and terminate in the New Haven code in no way warrants the conclusion that they do not carry FX traffic.

Global's next contention as to these DS3 circuits is that Global has satisfied section 5.4.6 of the ITR when it transports the traffic eventually carried on these DS3s from the Global customer to Global's hut in the New Haven local calling area. By doing so, Global claims it has "transport[ed] traffic between its foreign exchange service customer and such code's geographic area." Global Opp. at 19 (citing ITR § 5.4.6). The traffic, according to Global, is then jointly carried over the fiber meet to SNET's New Haven end users.

In response, SNET claims that not only must Global transport traffic between its

FX customer and Global's New Haven hut, but it must also transport traffic between the Global hut in New Haven and other locations within the New Haven local calling area. Otherwise, Global would not be "*solely* responsible to transport traffic between its foreign exchange service customer and such code's geographic area," SNET Memo. at 12 (citing ITR § 5.4.6), since SNET would be partially responsible for traffic within the New Haven local calling area.

As SNET properly asserts, "[t]he proper interpretation of an unambiguous contract is a question of law for the court" that can be resolved at summary judgment. Omni Quartz, Ltd. v. CVS Corp., 287 F.3d 61, 64 (2d Cir. 2002). As such, the court finds that the language of section 5.4.6 of the ITR Appendix is unambiguous. It clearly states that, when Global provides FX service to customers outside the New Haven local calling area, Global assumes total responsibility for traffic between its customer and the NXX's geographic area. See ITR Appx § 5.4.6. If SNET and Global jointly take a signal from the New Haven fiber meet to another New Haven location on SNET's side of the POI, then Global has not "solely" provided for the transport of that signal between its FX customer and the New Haven NXX geographic area. After all, a communication "between" a New Haven location on SNET's side of the POI and a Global FX customer is still a communication "between" the FX customer and the New Haven NXX's geographic area.

Global's interpretation of section 5.4.6 would certainly hold true if section 5.4.6 read that Global was solely responsible for transporting traffic between its FX customer and the POI located in the NXX code's geographic area. Global would also likely

prevail if section 5.4.6 called for it to take sole responsibility of traffic from its FX customer "to" the NXX code's geographic area. In both instances, Global could fulfill its duties by taking the signal "to" the New Haven POI. However, section 5.4.6 contains no such limiting language. The court thus concludes that Global was responsible for providing the "New Haven to New Haven" DS3s under section 5.4.6 of the ITR Appendix.

### 2. ICA Liability for the SS7 Signaling Links

There is no dispute that the signaling facilities that Global ordered (one DS1 circuit and four SS7 signaling links) do not fit within section 5.4.6 of the ITR as FX services. However, SNET claims that, because there is no SS7 Appendix in the ICA, SNET was not required to provide these circuits at its own expense. Global contests this assertion by invoking the general rule of the ICA that each party is responsible for maintaining facilities on its own side of the POI. See NIM App. § 2.4. According to Global, the NIM Appendix encompasses all facilities unless they are specifically exempted. Consequently, Global believes there was no need for an SS7 Appendix because these circuits are governed by section 2.4. In rebuttal, SNET argues that the NIM Appendix only covers "the physical architecture for Interconnection . . . for the transmission and routing of Telephone Exchange Service Traffic and Exchange Access traffic . . . " NIM § 1.1. Because there is no dispute that the SS7 signaling links are not transport facilities and, thus, do not carry telecommunications traffic, SNET concludes that the NIM does not pertain to the SS7s.

The court finds that there is a material issue of fact regarding which party was responsible for the costs of the SS7 links. Though these links may not be transport

13

facilities that provide for "transmission" within the meaning of the NIM Appendix, it is unclear from the parties' submissions whether this also means that the SS7s are not used for the "routing" of exchange service or exchange access traffic. Based on SNET's own evidence, it certainly appears they might be. The parties agree that these circuits are essential to determining "how to set up and terminate the communications path for a particular call." SNET L.R. 56(a)(1) Stat. at ¶ 26. At first blush, setting up and terminating communications paths would seem to qualify as "routing" under the NIM Appendix. Because SNET has not come forward with evidence showing that the SS7's are not involved in the routing of Telephone Exchange Service Traffic and Exchange Access traffic, the court finds that there is a material issue of fact on this matter. The court therefore denies summary judgment to SNET as to the SS7 signaling links.

   3.   ICA Liability for DS3s Carrying Enhanced Service Provider Traffic

   SNET next argues that it was not required by the ICA to pay for the DS3s that Global used, at least in part, to carry traffic from Global's ESP customers to SNET's end-users. SNET then notes that the ICA only requires SNET to maintain facilities on its side of the POI for the transport of local telecommunications traffic (also known as telephone exchange service traffic) and exchange access traffic. SNET Mem. at 17-18 (citing ITR § 46.5.1 and NIM Appx. § 1.1). Citing testimony from James Robert Jordan Scheltma, Global's Assistant General Counsel and Director of Regulatory Affiars, SNET argues that Global does not provide local service or exchange access service. SNET Mem. at 18 (citing, *inter alia*, Scheltema Dep. at 129, App. Tab Z).

14

Global never refutes SNET's portrayal of Scheltema's testimony in its Opposition. Instead, Global relies on a denial in its Local Rule 56 Statement in which it states that, "ESP traffic is an information service that are (sic) treated as local services as a result of Federal Communications Commission decisions, industry practice, and terms of ICAs." Global L.R. 56(a)(2) Stat. at ¶ 86. Global then vaguely references its 44-page Memorandum in Support of Global's Motion to Dismiss (Doc. No. 12) to bolster its contention that ESP traffic should be treated as a local service. However, the entire tenor of Global's Motion to Dismiss was that the FCC had not settled on how to classify enhanced service. See Mem. in Supp. of Global's Motion to Dismiss at 14-18. Global's prior Memorandum provides no guidance on the question of whether ESP traffic is actually considered a local service under the terms of the ICA between SNET and Global. In the absence of any evidence that it is a local service, the court finds that SNET was not obligated to pay for these DS3s under the ICA.

C. **Global's Liability to SNET for Special Access Service Under SNET's Federal Tariff**

SNET alleges that it provides high-capacity DS1 and DS3 circuits under Section 7 of its federal tariff. That section states, in relevant part, that special access "provides a channel, or transmission path, . . . to connect a customer premises to a . . . Telephone Company location where multiplexing functions are performed. SNET Tariff F.C.C. No. 39, § 7.1. The central dispute between the parties is whether the circuits in question provide a transmission path that connects SNET's network to Global's network. As the twenty-one DS1 and DS3 circuits that SNET claims are special access are the subject of cross motions for summary judgment, the court may only grant

summary judgment on the basis of facts undisputed by the parties.

To prevail on its claim that the circuits in question connect a SNET location to a Global location, SNET first relies on a stipulation of fact between the parties which states that the DS3 circuits "connect SNET access tandem locations to a Point of Interconnection ['POI'] between SNET and Global NAPs."  Form 26(f) Report, Stip. No. 6 (Doc. No. 24.)  According to SNET, this stipulation demonstrates that SNET provided Global with special access circuits because the POI, being the physical location where the parties' networks link to interconnect, is necessarily a point on Global's network.

Global disputes this assertion by stating that the meaning SNET attaches to the POI is not the meaning that Global intended when entering into the stipulation.  Instead, Global asserts that the "POI" in the Rule 26 stipulation is actually a "combination of facilities - fiber cable, multiplexers, DACS, patch panels - that allow traffic to pass between networks."  Devito Rep. at 9, Ex. 10 to Global Memo.  From this, Global states that, because the POI in the stipulation is a facility type arrangement, rather than the POI on the OC-48 fiber meet at the Global manhole, SNET cannot rely on the stipulation to show that the circuits at issue physically connect to a Global premises.

The court finds that the parties dispute the meaning to be ascribed to POI in the Rule 26 stipulation.  However, the court will not decide whether the parties' dispute creates a material issue of fact because it resolves Global's liability under SNET's federal tariff on an alternative basis.

The parties do appear to agree on the fact that the circuits in question began at remote SNET tandem offices and traveled to a multiplexing facility ("MUX") in SNET's New Haven tandem office.  SNET's MUX, in turn, connected to the fiber meet, which

16

then extended to a MUX in the Global Hut. After the DS3 transport facilities were completed, Global and SNET designated a particular DS3 "channel" on the fiber meet that would carry traffic from the MUX in SNET's tandem office to the MUX in the Global Hut. Global Mem. at 9; Global L.R. 56(a)(1) Stat. at ¶ 17.

Global's interpretation of these undisputed facts is that none of 21 DS3s directly connects to a Global premises, since the circuits only physically connect to the SNET MUX. Because the DS3s terminate on the SNET network, the only way SNET could collect for the DS3s, in Global's view, would be to charge Global for the channels on the fiber meet that the parties designated to carry the DS3 circuits from SNET MUX to the Global MUX. As the fiber meet was jointly provisioned by the parties and is not a special access facility, however, Global contends that SNET cannot charge the twenty-one DS3 channels on the fiber as special access.

SNET's basic response is that the DS3 necessarily provided a transmission path from SNET's network to Global's network because, "[i]f the DS3 circuits ended at SNET's New Haven tandem, then the traffic on those circuits could never have reached Global's network." SNET Opp. at 3. SNET then notes that, in ordering the DS3 circuits, Global entered codes indicating that it desired DS3 circuits that would terminate at Global's New Haven hut. Though Global disputes that the order forms demonstrate that SNET provided DS3 circuits as requested, SNET contends that the order form is consistent with Global's admission that the parties opened up DS3 channels on the fiber meet to carry DS3 traffic from SNET's network to Global's network. To SNET, whether the DS3 physically terminate in Global's hut is irrelevant. By linking the DS3 to the SNET MUX and having the circuits ride over the fiber meet, SNET asserts that it

provided a transmission path between it and Global. With regards to the fiber meet itself, SNET argues that it is not charging Global for facilities on the fiber meet, but, rather, for DS3 transmission paths that it provided at Global's request.

The court finds that, regardless of whether the DS3s physically terminate on a Global premises, the DS3s do provide a transmission path connecting the parties' networks. As a preliminary matter, nothing in SNET's federal tariff limits the definition of special access circuit to something that provides a "physical" or "direct" connection between the relevant networks. To reiterate, a special access circuit need only provide a channel or transmission path to connect the parties. Absent the DS3s at issue, as SNET points out, the Global and SNET networks could not have exchanged the traffic assigned to those circuits. Such an arrangement most certainly constitutes a connecting path between networks. The court thus finds that the circuits at issue are special access within the meaning of SNET's tariff.

As a last gasp to avoid liability under SNET's federal tariff, Global claims that SNET cannot prevail because the Global employees who placed the relevant orders "did not intend to order circuits that terminated at the Global hut." Global Opp. at 13. However, as the court has already discussed, see Ruling, *supra* at 9, n.3, Global's intent is irrelevant under the filed rate doctrine. See also AT&T v. Central Office Telephone, Inc., 524 U.S. 214, 222 (1998) ("Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed.") The court therefore finds that, under the filed rate doctrine, SNET is entitled to summary judgment with respect to the 21 special access circuits that it provided to Global.

**C.**     **Global's Motion for Summary Judgment with Respect to SNET's CUTPA Claim**

Under the CUTPA, "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).  According to Global, SNET cannot maintain a CUTPA claim because the breach of an obligation to pay money, whether under a tariff or a normal contract, is not enough to establish an unfair trade practice.  Global Memo. at 27; Global Reply at 9.  Global then asserts that SNET cannot prove that Global engaged in any fraudulent conduct by refusing to pay SNET's alleged tariff rates. Global Memo. at 27 (citing Heaven v. Timber Hill, LLC, 2004 WL 2547440 at *4 (Conn. Super. Oct. 21, 2004).

SNET presses that Global is not entitled to summary judgment on the CUTPA claim pursuant to the "cigarette rule."  SNET Opp. at 17 (citing Fabri v. United Technologies Intern., Inc., 387 F.3d 109, 119-120 (2d Cir. 2004).  Under the cigarette rule, a practice can be found to violate CUTPA even if that practice did not involve deception.  Fabri, 387 F.3d at 120 n.1.  In determining whether there has been an "unfair" practice in violation of CUTPA, the court must weigh:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (competitors or other businessmen).

Id. at 120 (quoting Cheshire Mortgage Serv., Inc. v. Montes, 223 Conn. 80 (1992)).

SNET argues, inter alia, that Global's alleged violations of SNET's federal tariff

were in contradiction of public policy, and that Global acted unethically and fraudulently when it ordered services from SNET's tariff without ever intending to pay for those servcies. As such, SNET contends there are issues of fact as to whether Global violated CUTPA. While Global protests SNET's assertions, the court finds that there are material issues of fact as to whether Global's conduct constitutes a CUTPA violation. Principal among these issues is, with the court having found that Global ordered special access circuits from SNET's federal tariff, whether Global intended to avoid its obligations under SNET's tariff by refusing to pay for the services it ordered. The court therefore denies Global's motion for summary judgment on SNET's CUTPA claim.

## IV.    CONCLUSION

For the foregoing reasons, SNET's Motion for Partial Summary Judgment (Doc. No. 281) is GRANTED in part and DENIED in part. It is GRANTED with respect to the twenty-one special access DS3 circuits.[4] It is DENIED with respect to the remaining five signaling facilities (one DS1 and four SS7s). Global's Motion for Partial Summary Judgment (Doc. No. 287) is DENIED. Global's Motion to Supplement the Summary Judgment Record (Doc. No. 369) is GRANTED.

---

[4]SNET did not include "Attachment 1" to Tab C of its exhibits, which purportedly details the amounts that Global owes to SNET for all of the circuits at issue. Therefore, the court cannot determine damages with respect to Count 1. The court orders SNET to file a motion to determine damages and attach a copy of "Attachment 1," and any other supporting documents. If the amount is contested, Global may submit an opposition to the amounts claimed by SNET.

**SO ORDERED.**

Dated this 26th day of March, 2007, at Bridgeport, Connecticut.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge