UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

THE SOUTHERN NEW ENGLAND          :
TELEPHONE COMPANY,                :
        Plaintiff,                :          CIVIL ACTION NO.
v.                                :          3:04-cv-2075 (JCH)
                                  :
GLOBAL NAPS, INC. et al,          :
        Defendants.               :          JULY 1, 2008


**SECOND AMENDED RULING RE: PLAINTIFF'S REDACTED MOTION FOR
DEFAULT JUDGMENT (Doc. No. 517), PLAINTIFF'S MOTION FOR DEFAULT
JUDGMENT (Doc. No. 519) AND DEFENDANT'S MOTION TO MODIFY THE
COURT'S OCTOBER 19, 2007 ORDER (DOC. NO. 618)**

## I.      INTRODUCTION

Plaintiff, Southern New England Telephone Co. ("SNET"), moves the court to

sanction defendants, Global NAPs, Inc., Global NAPs New Hampshire, Inc., Global

NAPs Networks, Inc., Global NAPs Realty, Inc., and Ferrous Miner Holdings, Ltd.[1]

(collectively "defendants"), for failure to comply with discovery orders.  The sanction

sought is a default judgment against the defendants pursuant to Federal Rule of Civil

Procedure 37(b).  See Pl.'s Mot. for Default at 1 (Doc. No. 519).

## II.     PROCEDURAL BACKGROUND

SNET brought this action against defendant Global NAPS, Inc. ("Global") on

December 7, 2004.  SNET's original Complaint alleged that Global had misrouted long-

distance traffic of certain circuits not designated for such traffic, thereby depriving SNET

of applicable access charges and that Global failed to pay SNET access charges

---

[1]This Second Amended Ruling is filed to correct the misidentification of a defendant,
Ferrous Miner Holdings, Ltd.

specified in SNET's federal tariff for special access circuits Global ordered from SNET's tariff. This court stayed SNET's misrouting claims under the doctrine of primary jurisdiction on October 26, 2005 (Doc. No. 38). On May 5, 2006, this court granted SNET's Motion for a Prejudgment Remedy in the amount of $5.25 million. <u>See</u> Transcript of Ruling, May 5, 2006 (Doc. No. 133). This court entered summary judgment in favor of SNET on twenty-one of the twenty-six circuits at issue on March 27, 2007 (Doc. No. 406).

On December 9, 2006, SNET filed an Amended Complaint, which added as defendants Global NAPS New Hampshire, Inc. ("Global NH"), Global NAPS Networks, Inc. ("Global Net"), Global NAPS Realty, Inc. ("Global Realty"), and Ferrous Miner Holdings, Ltd. ("Ferrous Miner"). All of the defendants are Delaware corporations with principal places of business at 10 Merrymount Street in Quincy, Massachusetts. SNET's Amended Complaint alleges that the defendants' corporate structure is a "sham" (Am. Compl. ¶ 15), and seeks to hold the defendants collectively liable for the underlying allegations set forth in SNET's original Complaint against Global.

### III.    FACTS

The long battle for discovery in this case began in earnest over two years ago, on May 5, 2006, when this court granted SNET's Motion for a Prejudgment Remedy in the amount of $5.25 million. <u>See</u> Transcript of Ruling, May 5, 2006 (Doc. No. 133). The court ordered Global to disclose assets sufficient to secure the prejudgment remedy within two weeks. <u>See id.</u> By May 24, 2006, Global had not complied with the court's May 5, 2006 Order, forcing SNET to file a Motion to Compel. <u>See</u> Motion to Compel (Doc. No. 142).

On May 26, 2006, this court issued a Ruling on SNET's Motion to Compel, finding that Global had failed to "comply to date in any acceptable manner."  See Ruling at 1 (Doc. No. 149).  At that time, the court entered a second, detailed Order requiring, in part, that Global produce an employee, pursuant to Federal Rule of Civil Procedure 30(b)(6), to testify on the existence of Global's assets and Global's current financial condition.  Id. at 2.  At that deposition, Global was ordered to  produce "information and documents relating to Global's current financial position" including tax returns and financial statements "from 2002 to the present" and, for every asset it disclosed that could go towards satisfying the prejudgment remedy, to provide "documents that describe or evidence the location, identity, and valuation, through objective criteria, of that asset."  Id.

A deposition was held pursuant to the May 26, 2006 Order on May 31, 2006.  At that deposition, Global's treasurer, Richard Gangi, testified that he had not brought any financial statements or tax records of any of the Global entities with him.   He further testified that he had "never seen" a financial statement prepared for "any of the Global entities" and that the only financial statement Global's accountant would have prepared would be that of Ferrous Minor.  Id. at page 95, lines 16-22.  These statements were patently untrue.[2]

Still having not received documentation in compliance with the court's May 5 or

---

[2] Only six months before, on November 17, 2005, Richard Gangi had identified "statements of income and expense of Global NAPs, Inc. for the years ended December 31, 2004, 2003, 2002, 2001 and 2000" at a deposition in different litigation.  See Notice, Doc. No. 226 at 5.  These documents had been prepared by defendants' accountants.  See Gangi Depo. at 94 line 25 and 95 lines 1-5, Ex. GG to Pl.'s Mot. for Default Judgment.

May 26, 2006 Orders, SNET filed a Motion for Contempt and Sanctions on June 12, 2006. <u>See</u> Motion for Contempt and Sanctions (Doc. No. 171). In opposition, Global argued, in part, that it could not be sanctioned for failing to provide the requested documents because they were not in the "custody or control" of Global. <u>See</u> Def.'s Mem. in Opp. to Pl.'s Mot. for Sanctions at 6 (Doc. No. 184). Global asserted that it was making "diligent attempts" to obtain tax returns, which it claimed were in the custody of its "corporate parent" Ferrous Minor; bookkeeping records, which it claimed were in the custody of its bookkeeper, Select & Pay, Inc.; and tax records, which it claimed were in the possession of its accountants, Nardella & Taylor. <u>Id.</u> at 6-8. At a hearing on this Motion, Richard Gangi testified to the court that he believed that general ledgers existed for Global and that his bookkeeper, Janet Lima of Select & Pay, had the ledgers but had not turned them over to Global, despite Global's requests. <u>See</u> Testimony of Richard Gangi at 104, Ex. II to Pl.'s Mot. for Def. Judg.

On November 27, 2006, the court ruled on SNET's June 12, 2006 Motion for Contempt and Sanctions, finding that the statement made by Richard Gangi that he had "never seen" a financial statement for any of the Global entities was "demonstrably false," and that it was "clear" that Global had violated the May 26, 2006 Order. <u>See</u> Ruling at 4 (Doc. No. 277). While the court found that Global had been "anything but forthcoming in complying with the court's May 5 and 26 Orders," the court was "not prepared to conclude that there is clear and convincing evidence to conclude that Global has acted with the bad faith necessary for the court to exercise its inherent contempt powers." <u>Id.</u> at 2-3. However, the court found Global had offered no "substantial justification" for violating the May Orders and ordered Global to pay SNET

4

"reasonable expenses caused" by its noncompliance.  Id. at 4.  Further, the court ordered Global to obtain their records from third-party entities Select & Pay, Inc. and Nardella & Taylor, and to produce them to SNET by December 6, 2006.  Id. at 5.  The court warned Global that failure to produce these documents would "likely result in the entry of a default judgment."  Id.  The records were not produced.

By June 21, 2007, it became clear that Global's claim that third-party Select & Pay was withholding their financial records was a lie intended to delay the production of financial records in compliance with SNET's discovery requests and the court's discovery Orders.[3]  On that day, Select & Pay's President, Janet Lima, signed an affidavit stating that, "Select & Pay does not keep or maintain or otherwise control Global's records, or any copies of them.  To the extent Select & Pay, Inc. prepares Global documents, they are left at the Global premises."  Lima Affidavit at ¶ 13, Ex. Z to Pl.'s Mot. for Def. Judg.  Further, Lima attested that, "the documents are actually kept in the client's custody and control."  Id. at ¶ 9.

In addition, Global violated the court's November 7, 2006 Order by failing to produce the records in question.  Even if one were to have accepted Global's position that it did not have custody of the records (which the court once did, but no longer does), Global violated the November 7, 2006 Order in that it failed to obtain its own records from its accountant and bookkeeper.  SNET eventually, by subpoena, obtained some records from the accountant, which had not previously been produced by Global.

_____

[3]The fact that Select & Pay did not maintain control over defendants' records was affirmed in a separate litigation, in which Select & Pay responded to a request for documents by stating that "none were presently in the control, custody or possession" of Select & Pay.  See Response from Select & Pay at 1-2, Ex. Y to Pl.'s Mot.

See, e.g., Financial Documents produced by Nardella & Taylor, Ex.'s G-O to Pl.'s Mem. in Supp.

Even after the fiction that Select & Pay had withheld Global's records was exposed, Global has still failed to provide its general ledger in accordance with this court's May 2006 Orders. On May 2, 2008, almost exactly two years after the court originally ordered Global to produce its financial records, when asked by the court why Global had failed to produce its general ledger, Global's counsel was unable to offer any credible explanation.

While Global's noncompliance with the court's May 2006 Orders dragged on, yet another discovery dispute arose. On April 17, 2007, SNET moved the court to compel Global to comply with twenty-nine requests for the production of documents relevant to SNET's veil-piercing allegations. See Pl.'s Mot. to Compel at 1 (Doc. No. 420). On May 31, 2007, this court granted SNET's Motion and ordered each of Global NAPs New Hampshire, Global NAPs Networks, and Global NAPs Realty to produce to SNET within two weeks "the books of the company," including "balance sheets, cash statements, registers, journals, ledgers" in "the form in which the records are kept," and within a slightly longer period to produce other financial documents that may have had to be gathered from third parties. See Motion Hearing, May 31, 2007. The court later extended this Order to include defendant Ferrous Minor Holdings, Ltd. See Motion Hearing, June 18, 2007. Global was subject to the same discovery requests that were the subject of this Order.

On June 15, 2007, defendants Global, Global NAPs Networks, Global NAPs New Hampshire and Global NAPs Realty (collectively the "Global defendants"),

produced documents; however, only about a dozen pages of which contained material not previously produced.  In lieu of the bookkeeping records ordered to be produced by the court, the Global defendants wrote a letter to opposing counsel explaining that they were "unable to locate copies of all the ledgers from the relevant time period."  <u>See</u> Letter from Miller to Jensen at 1, Ex. B to Pl.'s Mot. for Def. Judg.  The letter relied on an Affidavit from James Scheltema, Vice President of Regulatory Affairs for Global NAPs, Inc.  <u>Id.</u>  Scheltema claimed that, on June 12, 2007, he had undertaken a "thorough, unannounced search of all three Global NAPs locations in Massachusetts" where he located "limited documents relevant to the production requests."  <u>Id.</u>  He attested that he "searched the hard drive of the computer used by Select & Pay. Although the hard drive had Peachtree [accounting] software, there was no data relating to a Global entity, merely the program."  Scheltema Affidavit at ¶ 15, Att. to Ex. A to Pl.'s Mot. for Def. Judg.

On June 21, 2007, Ferrous Minor's counsel reported to SNET via email that Scheltema's search included a search for Ferrous Minor's documents.  <u>See</u> Email, Ex. C to Pl.'s Mot. for Def. Judg.  Ferrous Minor did not produce any documents despite the fact that its Director, Frank Gangi, testified on June 12, 2007, in different litigation, that "Ferrous Minor generates its own separate financial statements," Frank Gangi Declaration at ¶ 15, Ex. D to Pl.'s Mot. for Def. Judg., and Richard Gangi had testified on May 31, 2006, that Global's accountants "would have the financial statements of Ferrous Minor Holdings."  Richard Gangi Depo. at 95, Ex. GG to Pl.'s Mot. for Def. Judg.

Defendants have falsely argued to the court that documentation for periods prior

to June 2006, did not exist because there had been "uncontroverted testimony that the computer Ms. Lima was using 'crashed' and all of her data was lost." Def.s' Mem. in Opp. at 8-9 (citing Sheltema Depo. at 66-69, Ex. 2 to Def.'s Mem. in Opp.). Defendants went on to speculate that the "crash occurred and [the] data [was] lost in the summer of 2006." Id. In fact, the "crash" of this computer should have had absolutely no impact on the production of discovery because Janet Lima testified that she "dropped"[4] the computer she had used for the last five years in late December 2006, *after* the court-ordered deadline for production had come and gone. Lima Depo. at 181-182, Ex. G to Pl.'s Suppl. Mem.

Not only was the computer "dropped" after the deadline for production had passed, but based on Lima's testimony, there is no reason to believe that data on the computer was irretrievably lost. Lima testified that the computer she dropped had been "turning itself off" and "things were popping up," so she picked up the computer to take it to Richard Gangi's office. Id. While carrying the computer, she fell down the stairs, dropping the computer, which broke into many pieces. Id. at 183. Lima picked up the pieces and left them in her office. She saw Richard Gangi take those pieces, along with the rest of the computer, out of her office in a plastic bag. Id. at 186. She never saw that computer again, or was informed of what happened to it. Id. Even assuming

---

[4]The court notes that Lima testified that she "dropped" her computer, whereas Scheltema testified that she told him it had a "meltdown" with respect to the "storage mechanism, the drive." See Lima Depo. at 118, Ex. G to Pl.'s Suppl. Mem. and Scheltema Depo. at 66, Ex. L to Pl.'s Suppl. Mem. Defendants' counsel had represented to the court that it "crashed," suggesting to the court a computer malfunction, not physical contact with the ground. See Def.s' Mem. in Opp. at 8-9 (citing Sheltema depo. at 66-69, Ex. 2 to Def.'s Mem. in Opp.)

that Lima's testimony should be credited that she dropped the computer and it broke into pieces, the hard drive of this "dropped" computer has never been produced. The defendants have never explained why documents were unretrievable from the hard drive, why the computer has not been produced, or where it is.

On January 19, 2007, defendants' tax accountants, Nardella & Taylor produced, pursuant to third-party subpoena, hard copy excerpts of many financial documents that defendants had never previously produced, including "excerpts of a general ledger, customer ledgers, fixed asset and depreciation spreadsheets, an aged payables journal, and an aged receivables report." Pl.'s Suppl Mem. at 2; Mem. in Support at 5-6 and Exhibits G-O. On June 25, 2007, Nardella & Taylor produced adjusted trial balance reports for defendants and summary financial statements for Ferrous Minor for the year ending December 31, 2006. See Pl.'s Suppl. Mem. at 2; Pl.'s Mem. in Supp. at 6 and Ex. P. Ed Taylor of Nardella & Taylor has testified that the hard copies of records he produced were largely created by defendants. See Ed Taylor depo. at 34, 49, 51. He also testified that he was sure he had seen a general ledger for defendants over the years. See id. at 70.

In light of defendant's failure to produce a general ledger in compliance with the court's May 31, 2007 Order, the parties jointly hired FTI Consulting to "image" the replacement computer "searched" by Sheltema and used by Janet Lima after her other computer "crashed." See Letter from FTI consulting to SNET's counsel, Ex. E to Pl.'s Mot. for Def. Judg. The expert found the only "active" financial data on the new computer involved a few days worth of check registers for June and July of 2007. Id. However, the expert did find an email attachment containing a sales journal for the year

9

2000, and using "forensic techniques," located a cash disbursement journal for June 1, 2006 through December 31, 2006 that had been deleted. Id.

Based on the expert's conclusion that at least one seemingly relevant financial document had been erased from Janet Lima's computer, the parties agreed to a more thorough examination of the computer. FTI consulting produced a second report, indicating that the application "Window Washer," a software program with the capability to "overwrite data and disk space" had existed on Janet Lima's computer. Letter from FTI Consulting at 1-2, Ex H to Pl.'s Suppl. Mem. in Supp. of Mot. for Def. Judg. ("Pl.'s Suppl. Mem."). Parts of this program were initially created on the morning of June 12, 2007, the same morning Scheltema arrived to "search" for responsive documents. See id.; Scheltema Affidavit at ¶ 15, Att. to Ex. A to Pl.'s Mot. for Def. Judg. FTI reported that, "[m]ore time would be needed to identify further components and registry entries of Window Washer as well as its forensic artifacts when executed." Id.

In a deposition of Lima taken November 28, 2007, Lima admitted installing and running Window Washer on her computer the morning Scheltema arrived on June 12, 2007. See Lima Depo. at 204-205, Ex. G to Pl's Suppl. Mem. She says that she ran the program because she was concerned that her personal information was on the computer, and she did not want anyone involved in this litigation to have access to it. See id. She further testified that she never ran Window Washer again. See id. at 209-210.

However, SNET hired LECG, LLC to conduct further forensic analysis of the computer. See LECG report, Appendix A to Ex. I to Pl.'s Suppl. Mem. LECG's analysis shows that, at the time Lima used Window Washer on the morning of June 12, 2007,

she did not merely use the program in its default mode, but chose the "wash with bleach" option, which overwrites deleted files. Id. at 9. While it is impossible to determine everything that was erased, LECG was able to determine that "file shortcuts" to files titled "2000 Sales Journal," "checkregisterNH7-12-2006," and "NH check Jan thru May 06" were deleted. Id. at 9-10.

LECG's Report further explains that Window Washer has a "data wiping utility" separate from the main program. Id. at 6. This program, called wwShred.exe, allows a user to manually erase files. For every file erased using this utility, the user must chose to "Shred (wash with bleach)" each individual file or directory, and then click again to confirm that they want to erase that file or directory. Id. LECG's analysis shows that Window Washer's data wiping utility was first used on June 16, 2007, on which day it was run three times, and was used again on June 20, 2007. Id. at 10-11.

In order to determine what, or how many files, have been deleted, LECG relies on "metadata." Id. at 2. Metadata is a record created for all files containing their name, the date, and where the data is stored on the disk, among other things. See id. Metadata is stored in a database called a Master File Table ("MFT"). Id. Generally, a deleted file maintains its metadata, so it is possible to determine some things about the deleted file even after it has been erased. See id. at 2-3. However, when a deleted file has no metadata, "it is likely that anti-forensics software has been employed by the user to erase the file and clear the MFT data." Id.

LECG determined that, out of 93,560 items in the MFT, nearly 20,000 had no metadata, meaning they had likely been erased using anti-forensic software such as Window Washer's Shred utility. Id. at 2-3. At least 103 of these files were "user

created files," that is, "substantive files created by a user as opposed to a computer generated record." Def.'s Suppl. Mem. at 10-11 (citing Expert Witness Report of Ashley, Ex. A to Def.'s Suppl. Mem. at 3). Window Washer was uninstalled from Lima's computer the night of June 20, 2007. Id. at 11. The "Disk Defragmenter" utility was used on Lima's computer on June 25, 2007. Id. at 13. While the Disk Defragmenter can be used to improve the computer's performance, it also makes forensic analysis of a computer more difficult when files have been deleted. Id. This was the first and only time the Disk Defragmenter was used on Lima's computer.

Defendants have also attempted to excuse their failure to produce documents by claiming that,

> [t]here is the possibility that there were additional financial documents that were in Richard Gangi's possession at the time of his death. Unfortunately, Mr. Gangi died intestate. . . the result of the absence of a will is that, under Massachusetts law, documents in the decedent's possession at the time of his death may not be searched nor removed from his house . . . .

Letter from Global's Counsel to SNET's Counsel at 2, Ex. B to Pl.'s Mem. in Supp. This explanation, like the suggestion that Select & Pay was withholding defendants' records or that defendants' records were necessarily lost when Lima dropped her computer, was a red herring devised to frustrate timely, indeed any, compliance with discovery orders. Sheila Gangi, Richard Gangi's ex-wife, testified at a deposition taken during the probate proceedings that she witnessed Janet Lima removing Richard Gangi's computer from Richard Gangi's home after his death. See Sheila Gangi depo. at 54 lines 17-23, Ex. 3 to Pl.'s Reply. She further testified that Lima told her the computer would be "emptied" and that she would bring it back to the house if Sheila Gangi

wanted it back.  Id.  Sheila Gangi also testified that, "[a]ll of Richard's mail, all of Richard's filing cabinet papers and the safe" were removed from the house.  Id. at 58. While Gangi did not see anyone remove the items from the filing cabinet, she later asked Frank Gangi to return the title to her truck (which had been in the filing cabinet) and subsequently received it from Lima in the mail.  Id. at 59.  She had conversations with Frank Gangi and Janet Lima about the truck title and the contents of the filing cabinet.  Id. at 63.  She also testified that, prior to Richard Gangi's death, she was the only person with the security code to Richard Gangi's house.  See Affidavit of Sheila Gangi, Ex. 3 to Def.'s Mem. in Opp.  She gave that code after Richard Gangi's death to Frank Gangi and to no one else.  Id.

On February 25, 2008 and March 7, 2008, defendants produced some additional financial documents not previously produced.  These documents included emails and attachments that were clearly subject to the court's November 27, 2006 Order or the court's May 31, 2007 Order.  See, e.g., Email from Anne Hartman dated February 23, 2007, Ex. M to Pl.'s Suppl. Mem.; Email from Anne Hartman dated May 29, 2006, Ex. N to Pl.'s Suppl. Mem.; Email from Anne Hartman dated July 7, 2006, Ex. O to Pl.'s Suppl. Mem.; Email from Anne Hartman dated August 18, 2006, Ex. P to Pl.'s Suppl. Defendants failed to produce them until after SNET had taken depositions for which the documents would have been quite pertinent.

## IV.    DISCUSSION

A district court may sanction a party who fails to comply with a discovery order of that court, including rendering a default judgment against the noncompliant party.  See Fed.R.Civ.P. 37(b)(2)(A)(v).  Such a sanction derives from the district court's "broad

13

inherent power to protect the administration of justice by levying sanctions in response to abusive litigation practices." Penthouse Int'l, Ltd. v. Playboy Enter.s, Inc., 663 F.2d 371, 386 (2d Cir. 1981) (citing Roadway Express, Inc. v. Piper, 447 U.S. 752 (1980) and National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639 (1976)). Rule 37 sanctions serve two purposes: "to penalize those whose conduct may be deemed to warrant such a sanction" and "to deter those who might be tempted to such conduct in the absence of such a deterrent." Id. (quoting National Hockey League, 427 U.S. at 643). District courts must have the power to dismiss cases with prejudice "in order to prevent undue delays in the disposition of cases and to avoid congestion in the calendars of the District Courts." Id. However, dismissal pursuant to Rule 37 is a "drastic remedy" that "should only be imposed in extreme circumstances, usually after consideration of alternative, less drastic sanctions." West v. Goodyear Tire and Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) (internal quotation and citations omitted). Notwithstanding that, "discovery orders are meant to be followed," and a party who "flouts such orders does so at his peril." Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 853, (2d Cir. 1995) (internal quotation omitted).

Dismissal is appropriate if there is a showing of "willfulness, bad faith, or fault on the part of the sanctioned party." Id. A party may also be found at "fault" sufficient to justify dismissal of the case if they were "grossly negligent" in following discovery orders. Penthouse, 663 F.2d at 387. While a showing of prejudice to the moving party is not a requirement for a dismissal under Rule 37, a court may consider it in weighing the appropriateness of the sanction. See Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Restaurant Employees Int'l Union, 212 F.R.D. 178, 229 (S.D.N.Y.

14

2003). In addition to willfulness or bad faith on the part of the nonmoving party and prejudice to the moving party, other factors that appear appropriate to this court to consider are the history, if any, of noncompliance, whether lesser sanctions would be effective, whether the noncompliant party has been warned about the possibility of sanctions, and the client's involvement. See American Cash Card Corp. v. AT&T Corp., 184 F.R.D. 521, 524 (S.D.N.Y. 1999).

A.  Defendants have willfully violated this court's discovery Order to produce their general ledger

Defendants have failed to produce their general ledger or ledgers in violation of the court's May 31, 2007 Order. The court's May 31, 2007 Order specifically required defendants to produce "balance sheets, cash statements, registers, journals, ledgers." It is clear from the testimony of Joan Conway, see Joan Conway depo. at 76, 81, Ex. D to Pl.'s Supp. Mem., and Richard Gangi, see Richard Gangi depo. at 87, Ex. E to Pl.'s Supp. Mem., and from the excerpts of the general ledger produced by defendants' tax accountants Nardella & Taylor, see general ledger excerpts, Ex. A to Pl.'s Suppl. Mem, that defendants possess or have possessed at some point during this litigation a general ledger. Defendants have offered no plausible explanation for why these business records have not been produced and, as such, the court finds that defendants have willfully violated the court's May 31, 2007 Order to produce general ledgers.

Defendants argue that production of the ledger was not necessary because "[t]here is no reason to believe that if it was available, a 'full' general ledger would provide any additional information not already in SNET's possession." Def.'s Suppl.

Mem. in Opp. ("Def.'s Suppl. Mem.") at 2 (Doc. No. 744). This argument misses the point for two reasons. First, as SNET points out, a general ledger, unlike the other bits and pieces of financial documents defendants have produced, "shows how, in the ordinary course of business, the defendants characterized and accounted for . . . inter-company transaction, if they accounted for it at all;" a general ledger shows how defendants "characterized and accounted" for revenue; and, a general ledger shows transfers of non-fund assets, such as network equipment. Pl.'s Suppl. Mem. at 4. This type of information is clearly relevant to SNET's veil-piercing claims and is not similarly disclosed through check registers, cash disbursement journals, and bank account statements, as defendants would suggest. Second, even if the general ledger were largely redundant of other discovery SNET received, which the court finds it is not, the court's May 31, 2007 Order specifically and unequivocally ordered defendants to produce "ledgers." Absent any objection to the Order, defendants claim at this late date that such production is unnecessary is frivolous.

Global further argues that it is not obliged to produce financial documents, including the general ledger, created prior to Spring 2006, because only at that point did those documents become "relevant to the litigation." Def.'s Suppl. Mem. in Opp. at 8. As this court stated at a hearing on October 3, 2007, "[t]his case was commenced at the end of 2004;" therefore "[f]rom and after the time this lawsuit was pending, there should not have been one piece of paper destroyed." Transcript of October 3, 2007 Hearing at 59 (Doc. No. 582). The court found that Global's financial records should exist for "at least" the years 2004-2007. See id. Defendants' counsel agreed, see id., and Global does not point to any objection it raised to any of the court's discovery

16

orders based on the argument that they were not on notice that such documents were relevant to the litigation.  Therefore, lack of notice does not suffice to excuse Global from producing documents predating 2006 in compliance with the court's May 31, 2007 Order.

Even if one accepts the suggestion that it was not until SNET filed its Motion to Amend (Doc. No. 192) on June 30, 2006, that the veil piercing defendants would have been on notice to preserve documents, it is completely implausible that absolutely no documents existed, on that date, that predated June 30, 2006.[5]  And yet, defendants have produced merely a few such documents.

The defendants have often defended SNET's Motions to Comply and other discovery matters by responding that SNET could not prove that any of the documents it sought were in existence, and in defendants' custody or control.  See, e.g.,  Global's Opp. to Pl.'s Mot. for Contempt and Sanctions at 2 (Doc. No. 184) ("SNET cannot prove that the purportedly 'missing' documents even exist, let alone that Global has withheld them intentionally and in bad faith"); Def.s' Mem. in Opp. to Pl.'s Mot. for Def. Judg. at 6 (Doc. No. 548)("SNET has not and cannot prove that financial documents exist that have not been produced by defendants or its agents.").  It is indeed often the case that an opponent complains about the lack of production of documents the opponent

---

[5]Despite defendants' failure to produce their general ledger or ledgers in violation of the court's discovery orders, there is evidence in the record that defendants were a multimillion dollar enterprise.  See e.g. Summary Financials, Ex. P to Pl.'s Mot. (showing $55 million in sales for Ferrous Minor in 2006); Global NAPs New Hampshire check register, Ex. S to Pl.'s Mot. (showing Global NAPs New Hampshire transferred millions of dollars to other Gangi-run enterprises).   The suggestion that they have no complete financial records as a matter of practice, rather than because they willfully destroyed them to avoid discovery, is incredible to this court.

"expects" that the non-producing party should, or likely would, have. Unfortunately for these defendants, the pieces of evidence obtained from Nardella & Taylor's eventual third-party disclosure demonstrates that the general ledgers, and other financial documents like "a sales journal, customer ledgers, a cash receipts journal, aged receivable reports, an aged payables journal, and records regarding the purchase of assets, loan receivables, and notes payable," (Pl.'s Mem. at 6 summarizing contents of Ex.'s G-O to Pl.'s Mem.) were created, and have either been destroyed or hidden to prevent their discovery. Testimony of the defendants' accountant that he was sure he had seen a general ledger for defendants over the years further supports this conclusion, see Taylor Depo. at 70, as does the testimony of Joan Conway, see Joan Conway Depo. at 76, 81, Ex. D to Pl.'s Supp. Mem., and Richard Gangi, see Richard Gangi Depo. at 87, Ex. E to Pl.'s Suppl. Mem. Evidence of detailed financial records was further uncovered in the forensic analysis of Lima's computer. See discussion of Lima's computer, Section IV. B, infra; excerpt of Sales Journal for Year 2000, Ex. E to Pl.'s Suppl. Mem. Furthermore, the court draws an inference from the destruction of evidence on Janet Lima's computer that defendants possessed relevant financial documents which they destroyed to avoid their discovery. In summary, the conclusion that defendants have willfully destroyed or hidden financial documents in violation of this court's orders is unavoidable.

B.    Global has erased computer documents in bad faith

The court finds that, based on the facts recited above, defendants willfully destroyed evidence contained on the computer used by Janet Lima, in violation of the court's November 27, 2006 and May 31, 2007 Discovery Orders.

Defendants make several unpersuasive arguments in an attempt to discredit SNET's expert report on the use of file shredding software on the disputed computer. First, Global argues that <u>only</u> 103 of the 53,100 deleted files are "user files," that is, "substantive files created by a user as opposed to a computer generate record." Def.'s Suppl. Mem. in Opp. at 10-11. Even crediting defendants' expert that this is the case, not one file should have been deleted, much less 103 files. <u>See</u> discussion of Court's admonition on October 3, 2007, discussed in section A, <u>infra</u>, at 16.

Defendants also argue, "it can be inferred that [plaintiff's expert] is aware" that Window Washer does not erase metatdata of MFT entries because, had Window Washer been the anti-forensics software used, SNET's expert "would have said so." <u>Id.</u> at 11. The court disagrees. The fact that a program with the capability to "overwrite data and disk space" was executed on Janet Lima's computer, Letter from FTI Consulting at 1-2, Ex H to Pl.'s Suppl. Mem. in Supp, in conjunction with evidence that files on Lima's computer had been "wiped" rather than merely deleted, convinces the court that at least Window Washer, and potentially other file wiping programs, were run on Lima's computer with the intent and result of irrevocably erasing files from that computer. Further, this activity on the computer did not occur in a vacuum; the defendants' persistent non-compliance with discovery is further support for the court's conclusion of intentional destruction of evidence.

Defendants next argue that, "that there is no proof that any files of consequence were deleted." Def.'s Suppl. Opp. at 13. This argument entirely misses the point. First, plaintiff need not prove that the deleted files were material; "the intentional or grossly negligent *destruction* of evidence in bad faith can support an inference that the

19

destroyed evidence was harmful to the destroying party." <u>Residential Funding Corp. v.</u> <u>DeGeorge Financial Corp.</u>, 306 F.3d 99, 110 (2d Cir. 2002) (emphasis in original) (internal citation omitted). SNET is not required to show that the destroyed files were material as long as it can prove that the deletion of the files was in bad faith.[6]

The court finds that the deletion of files in this case was done in bad faith. Defendants argue that Lima's use of Window Washer is "regrettable" but excusable, because she merely wanted to protect her personal information. Def.'s Suppl. Mem. at 13. The court finds this explanation entirely incredible. First, the court credits SNET's expert report, which found that Lima did not merely use Window Washer in its default mode, which "empties the Recycle Bin, clears the Internet browsing history and cookie files, clears certain temporary folders, and clears the Recent Documents history." Pl.'s Suppl Mem. at 11. Instead, she deliberately chose to use the "wash with bleach" option to permanently delete and overwrite files that clearly did not contain her personal information, including files named "2000 Sales Journal, "NH check Jan thru May 06," "checkregisterNH7-12-2006", and "cashrecINC7-12-2006". LECG report at 9, App. A to Ex. I to Pl.'s Suppl. Mem. Even if Lima intended only to erase her personal information, which the court does not find to be the case, her actions would be at the least grossly negligent given that the court had ordered discovery of defendant's bookkeeping records and Lima had been specifically told not to destroy any records starting at the beginning of this litigation. <u>See</u> Lima Depo. at 122-3, Ex. G to Pl.'s Suppl. Mem. "Grossly negligent failure to obey a discovery order may justify severe disciplinary

---

[6]Further, in a case that seeks recovery under a pierce-the-corporate-veil theory, the corporate accounting and financial records are necessarily material.

measures," even dismissal under Rule 37.  Penthouse, 663 F.2d at 387.   Furthermore, the court finds that the "shredding" feature of Window Washer was used on June 16, 2007 and June 20, 2007.  Given that the shredding utility requires that a user confirm his or her intent to shred files, as described above, permanently destroying files using this utility can only be described as willful.  Because the computer was in the possession and control of the defendants at all times, the conclusion that this program was used intentionally to destroy files that should have been preserved is inescapable.  Such a conclusion is bolstered by the fact that the computer's Disk Defragmenter was run, for the first and only time, on June 25, 2007.  While defendants urge that this program was used to improve the computer's performance, see Def.'s Suppl. Mem. at 15, the court does not credit this explanation in light of the earlier deletion of files, and given that the program makes forensic discovery of deleted files more difficult.  See LECG Report at 13, Appendix A to Ex. I to Pl.'s Suppl. Mem.   In light of the fact that a shredding utility had been used to permanently delete files only days before, the timing of the use of the Disk Defragmenter only corroborates the court's conclusion that defendants had willfully destroyed evidence and then attempted to conceal their actions.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).  "A federal district court may impose sanctions under Fed.R.Civ.P. 37(b) when a party spoliates evidence in violation of a court order."  Id.  In June 2007, defendants were clearly subject to the court's May 31, 2007 Order to produce financial documents.

Defendants have failed to offer any credible explanation for why documents on their computer, which was used by their bookkeeper, were destroyed within a month of the court's Order. Therefore, the court concludes that the defendants' destruction of documents relevant to this litigation was, at best, gross negligence in the case of Lima's admitted deletions, and at worst, bad faith, intentional destruction in the case of the use of the shredding application later in that month.

      C.     Richard Gangi lied to the court that defendants' bookkeeping records were in the control of Select & Pay in an attempt to delay discovery.

The court finds that Richard Gangi's testimony that defendants' accounting firm was withholding bookkeeping records, despite requests from defendants for those records, was willfully false. See Testimony of Richard Gangi at 104, Transcript of Hearing October 11, 1006, Ex. II to Pl.'s Mot. for Def. Judg. While the court does not credit all of Lima's testimony, the court does credit her testimony that defendants' bookkeeping records were always within their own control. See Lima Affidavit at ¶ 13, Ex. Z to Pl.'s Mot. for Def. Judg. Despite a specific Order to obtain the records from their accountant and bookkeeper, defendants offer no explanation as to what efforts it took to obtain them and why they did not succeed. There is no record before this court evidencing an accountant willfully refusing to provide defendants their documents, despite repeated requests, or even a lawsuit asserting a replevin claim. Absent any plausible alternate explanation for Gangi's testimony, the court concludes that Gangi intentionally lied to the court with the purpose of delaying the discovery of bookkeeping records in compliance with the court's discovery Orders.

      D.     Frank Gangi Caused Documents and a Computer to be Removed from Richard Gangi's House

Defendants suggested that additional financial documents may have been in the possession of Richard Gangi, but could not be searched until his estate was settled. See Letter from Global's Counsel to SNET's Counsel at 2, Ex. B to Pl.'s Mem. in Supp. The court finds that, while making this excuse, Frank Gangi directed his agents and employees, including Janet Lima, to remove Richard Gangi's computer from his house and to empty his home filing cabinet of documents. The court understands that Sheila Gangi never saw Frank Gangi remove anything from Richard Gangi's house, nor did she see anyone remove the files. However, the court credits Sheila Gangi's testimony that she spoke with Frank Gangi and Janet Lima about the contents of the file cabinet, and that, after requesting Frank Gangi to return a document that had been in the cabinet, Janet Lima returned them to her. In these circumstances, the inference that Frank Gangi had the contents of Richard Gangi's filing cabinet removed from the house, at the same time defendants were using Richard Gangi's estate as an excuse for failing to produce relevant discovery, is unavoidable. Furthermore, the court credits Sheila Gangi's testimony that she witnessed Janet Lima remove Richard Gangi's computer from his home and offer to bring it back after it had been "emptied."[7] See Sheila Gangi Depo. at 54 lines 17-23, Ex. 3 to Pl.'s Reply. In summary, the court finds

---

[7]The court credits Sheila Gangi's testimony concerning events following Richard Gangi's death despite not having the benefit of observing the relevant witnesses on the stand. Sheila Gangi's testimony is corroborated by the defendants' prior and subsequent persistence in refusing to produce documents. While Sheila Gangi may have had reason to mislead the court, although the court does not find that she did, the defendants have demonstrated that they will mislead, and have misled, the court. Further, while defendants have attacked the credibility of Sheila Gangi's testimony, they have offered no credible evidence to contradict her version of events, instead quibbling over words she used ( Frank Gangi removing items, versus Frank Gangi's agents removing items).

that the defendants deliberately removed Richard Gangi's computer[8] and paper files that had been in the possession of Richard Gangi, have not produced those documents or computer despite court Orders, and meanwhile used Gangi's death to further delay and frustrate compliance with the court's discovery orders.

E.      Defendants have given misleading and nonresponsive answers to discovery requests

On several occasions, defendants have given SNET misleading or non-responsive answers to discovery requests.  For example, Global NAPs Realty told SNET (May 4, 2007 email from Global NAPs Realty counsel to SNET, Ex. W to Pl.'s Mem.), and the court (Hearing on May 31, 2007) that it did not have a bank account.  It later recanted this statement, but has still not produced statements for that account. See Pl.'s Mem. at 15.  Similarly, in response to SNET's discovery requests, Global NAPs New Hampshire produced only a cash disbursement journal for June 2006 through April 2007 and referred SNET to Global NAPs, Inc. records, which Global NAPS New Hampshire's counsel later admitted were nonresponsive.  Hearing of May 31, 2007.

F.      Defendants have a history of violating discovery orders

As discussed above, the court has already found that the statements made by Richard Gangi indicating that he had "never seen" a financial statement for any of the Global entities was "demonstrably false," and that it was "clear" that Global had violated the May 26, 2006 Order.  See Ruling at 4 (Doc. No. 277).  The court sanctioned Global

---

[8]There was also a second laptop computer used by Richard Gangi, which he had at the hospital before his death, and which computer Frank Gangi removed from the hospital, that has not been produced.  See Sheila Gangi Affidavit at ¶ 11, Ex. DD to Pl.'s Mot.

for this violation by requiring it to pay SNET's expenses in prosecuting that Motion to Compel.  See id.

More significantly, on July 9, 2007, the court found Global in civil contempt for violating the prejudgment remedy Orders of May and October 2006.  See Ruling re: Plaintiff's Motion for Contempt and Sanctions at 11 (Doc. No. 496).  In that Ruling, the court found "there to be clear and convincing proof that Global's conduct was a blatant violation of the court's clear and unambiguous" orders.  Id.  The court imposed civil contempt sanctions in the form of SNET's costs in prosecuting the Motion for Contempt and Sanctions, including attorneys' fees, expert fees, and other costs.  See id. at 13. The court subsequently granted SNET $645,760.41 in costs and fees.  See Ruling re: Motion for Costs and Fees (Doc. No. 757).

The Second Circuit's discussion of the relevance of past actions in Penthouse is exactly on point:

> It would be excessively formalistic to view the defiance of [an] order in isolation rather than against the background of Penthouse's prolonged and vexations obstruction of discovery with respect to closely related and highly relevant records . . . which Penthouse kept from Playboy and from the court during the pretrial and trial of the case through perjurious testimony of its top officials and false representations to the court by its counsel.

Penthouse, 663 F.2d at 388.  "Sanctions must be weighed in light of the full record in the case."  Id. (internal citation omitted).

Defendants' past violations weigh heavily in favor of imposing a default judgment against them at this time.  The court has imposed lesser sanctions on defendants to no avail.  In light of these prior sanctions, the court is confident that sanctions less severe

than default would not be effective in deterring defendants from continuing to violate discovery and other court orders. Certainly orders compelling disclosure and imposing monetary sanctions have not worked. See, e.g., Order and Ruling of May 26, 2006 (Doc. No. 149); Ruling on Motion for Contempt of June 10, 2007 (Doc. No. 496). While adverse inferences can be effective tools for situations involving the destruction of evidence, in this case the extent of defendants' noncompliance and either wilful withholding or destruction is so extensive that any adverse inference sufficient to sanction defendants and address the harm to SNET would effectively amount to a directed verdict or the equivalent of a default judgment.

G. Plaintiffs have been prejudiced and judicial resources squandered

While a finding of prejudice to the plaintiffs is not necessary for the imposition of a default judgment, see Met. Opera Ass'n, Inc., 212 F.R.D. at 229, the court finds that defendants' violations have prejudiced SNET. There can be no doubt that a delay of over a year and a half in producing court ordered discovery has prejudiced its ability to prepare its case for trial. Furthermore, SNET was prejudiced by having to conduct the depositions of Ed Taylor, Ann Hartman, Janet Lima, and Joan Conway without the benefit of defendants' most recent productions. Defendants argue that, "SNET was advised that the supplemental production would be forthcoming before the depositions, but made the strategic decision to press ahead without additional documents." Def.'s Suppl. Mem. at 16. Given the repeated delays and intransigence by defendants in following discovery orders, SNET was wise to discount any promise from defendants that discovery would be forthcoming and proceed with the depositions when they could get them. Having followed that wise course, SNET has been prejudiced by their

inability to use the recently produced documents during those depositions.

Another factor the court considers is the tremendous waste of judicial resources defendants have caused by their repeated violations of the court's discovery orders. Defendants' "prolonged and vexation destruction of discovery," 663 F.3d at 338, has caused a morass of discovery disputes. The Second Circuit in Playboy expressed its concern that,

> If parties are allowed to flout their obligations, choosing to wait to make a response until a trial court has lost patience with them, the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules.

Penthouse, 663 F.2d at 388. The Second Circuit's concern in Playboy has come to fruition in this case, with the court holding many lengthy hearings on discovery motions, and spending innumerable hours dealing with defendants' recalcitrance. In this circumstance, a default judgment is warranted to prevent defendants' wilful noncompliance and destruction from impacting the court's other cases and thus impacting the orderly administration of justice for other litigants.

H.    Global was clearly put on notice that failure to produce their general ledger would result in the court entering default against them.

While default judgment is a proper remedy as long as a party had notice of a discovery order, see United States Freight Co. v. Penn Central Transport., 716 F.2d 954, 955 (2d Cir. 1983), the court went even further to explicitly put Global on notice that failure to produce its general ledger would "likely result in the entry of a default judgment." See Ruling at 4 (Doc. No. 277). That Ruling was made on November 27, 2006. A clear and unambiguous warning that default would enter is apparently not enough to cause Global to comply with this court's Orders.

## V.     CONCLUSION

The court finds that all defendants have willfully violated the court's discovery orders by failing to turn over their general ledgers and other business records, lying to the court about the inability to obtain documents from third parties, and destroying and withholding  documents that were within the scope of the discovery requests and Orders.  These defendants have committed a fraud upon this court.  These willful violations have prejudiced, indeed likely destroyed, SNET's ability to prove its case, and have squandered judicial resources by dragging the court into frequent policing of discovery disputes over an inordinate period of time.  In light of the defendants' history of violations, and the explicit warning that failure to comply would result in a default judgment entering, the court finds that lesser sanctions would not deter the defendants from further delaying discovery in this case.  Indeed, the court has little confidence that the discovery sought continues to exist.

In conclusion, defendants' behavior exemplifies the type of willful disregard for the process of discovery created by the Federal Rules of Civil Procedure that warrants the ultimate sanction of dismissal.  Defendants "rolled the dice on the district court's tolerance for deliberate obstruction," and this court does not believe they should be allowed to "return to the table."  <u>Bambu Sales</u>, 58 F.3d at 853.

For the forgoing reasons, plaintiff's Motions for Default Judgment (Doc. Nos. 517 & 519) are GRANTED.  Those of SNET's claims which involve IP-related transmissions and were stayed pending determination by the Federal Communications Commission of the issues raised in the plaintiff's Complaint (Counts II through VII and part of Count 1), <u>see</u> Ruling (Doc. No. 38), are administratively DISMISSED without prejudice to reopen

if a Motion to Reopen is filed within thirty days of the final administrative action which restores jurisdiction over those claims to this court. The Clerk is ordered to enter judgment in favor of the plaintiff on all other claims and against the defendants, jointly and severely, in the amount of $5,247,781.45. (The Judgment should also include the award of fees and costs of $645,760.41 see Doc. No. 757.)

Global's Motion to Modify the Court's October 19, 2007 Order is DENIED. The court credits Sheila Gangi's testimony that Frank Gangi did remove Richard Gangi's laptop from the hospital. See page 21, n.6 infra. Alternatively, the Motion is moot in light of the default judgment. SNET's Motions to Amend (Doc. No. 770) and to Register (Doc. No. 771) are denied as moot. The Clerk is directed to enter judgment and to close this case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 1st day of July, 2008.

_____
/s/ Janet C. Hall
Janet C. Hall
United States District Judge